McNALLY CPA's & CONSULTANTS, S.C., Plaintiff-Appellant,

v.

DJ HOSTS, INC., Defendant-Respondent.

Court of Appeals

*No. 03–1159. Oral argument December 9, 2003.—Decided November 24, 2004.*

2004 WI App 221

(Also reported in 692 N.W.2d 247.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Randall J. Andersen* and *Robert A. Mich, Jr.*, of *Kay & Andersen, S.C.*, Madison. There was oral argument by Randall J. Andersen.

On behalf of the defendant-respondent, the cause was submitted on the brief of and oral argument by *Michael P. Murphy* of the *Ho-Chunk Nation Department of Justice*.

Before Deininger, P.J., Dykman and Lundsten, JJ.

¶ 1. LUNDSTEN, J. The Ho-Chunk Nation purchased 100% of the shares in DJ Hosts, Inc., a for-profit Wisconsin corporation. After the purchase, McNally CPA's, an accounting firm, sued DJ Hosts for money owed. The circuit court dismissed McNally's action

based on tribal sovereign immunity. The court reasoned that because the Ho-Chunk, a federally recognized Indian tribe, wholly owns DJ Hosts, the Ho-Chunk's immunity extends to DJ Hosts. We disagree. DJ Hosts argues that the circuit court's decision should be upheld on the alternative ground that the Ho-Chunk is an indispensable party that may not be joined. We conclude that the Ho-Chunk is not an indispensable party. Accordingly, we reverse the circuit court's order and remand for the court to allow McNally to proceed with its action against DJ Hosts.

### *Background*

¶ 2. A brief description of the corporate history of DJ Hosts puts this case in the proper context. In August 1990, Carley Development Company, Inc., was organized as a for-profit Wisconsin corporation. Carley's name was changed to DJ Hosts in January 1995 by amendment to its articles of incorporation. The Ho-Chunk purchased all of the stock in DJ Hosts approximately two months after the name change.

¶ 3. McNally sued DJ Hosts in October 2000, claiming that DJ Hosts owed McNally approximately $29,000 plus interest for accounting, consulting, and other professional services. After DJ Hosts failed to timely answer McNally's amended complaint, McNally unsuccessfully moved for a default judgment. McNally later brought a second motion for default judgment, but before the circuit court decided McNally's motion, DJ Hosts moved to dismiss. DJ Hosts advanced two main arguments in support of its motion: (1) that the Ho-Chunk's sovereign immunity barred McNally's action against DJ Hosts, and (2) that the Ho-Chunk was an indispensable party under WIS. STAT. § 803.03

(1999–2000),[1] such that, once joined, the Ho-Chunk's presence in the suit would require dismissal on immunity grounds.

¶ 4. The circuit court granted DJ Hosts' motion and dismissed McNally's action, concluding that the Ho-Chunk's sovereign immunity extended to DJ Hosts. The court did not address the indispensable party issue, presumably because the court's decision on immunity was dispositive. McNally appeals.

## Discussion

### Whether the Ho-Chunk's Immunity Extends to DJ Hosts

¶ 5. The parties agree that, but for the Ho-Chunk's status as an Indian tribe, DJ Hosts would be liable to McNally for fees for services that McNally rendered to DJ Hosts. The dispute centers on whether the Ho-Chunk's immunity from suit extends to DJ Hosts. That is a question of law, which we review *de novo. See C & B Invs. v. Wisconsin Winnebago Health Dep't,* 198 Wis. 2d 105, 108, 542 N.W.2d 168 (Ct. App. 1995).[2]

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

[2] The parties submitted affidavits in support of their respective positions on DJ Hosts' motion to dismiss, and the circuit court treated the motion as one for summary judgment. This court reviews summary judgment decisions *de novo,* applying the same methodology employed by the circuit court. *Brownelli v. McCaughtry,* 182 Wis. 2d 367, 372, 514 N.W.2d 48 (Ct. App. 1994). That methodology is well established and need not be repeated in its entirety. *See, e.g., Lambrecht v. Estate of*

¶ 6. We begin with the proposition that an Indian tribe's purchase of a corporation's stock does not normally confer tribal immunity on the corporation. We think it is self-evident that if a tribe purchases, for example, shares in Microsoft, Microsoft does not gain tribal immunity in any measure. Moreover, the Ho-Chunk has not suggested that it matters that shares in DJ Hosts are not publicly traded. That is, the Ho-Chunk does not suggest that, for purposes of analyzing tribal immunity, there is a difference between a tribe owning shares of a publicly traded company, like Microsoft, and a tribe owning shares of a non-publicly traded company, like DJ Hosts.

¶ 7. Accordingly, the narrow question we address is whether tribal immunity is conferred on a corporation when all of the shares of that corporation are purchased by an Indian tribe. Applied to the facts here, the question is whether the Ho-Chunk's purchase of 100% of the shares of DJ Hosts conferred tribal immunity on DJ Hosts. We conclude that when the sole facts are that an Indian tribe purchases all of the shares of an existing for-profit corporation and takes control over the operations of the corporation, tribal immunity is

---

*Kaczmarczyk*, 2001 WI 25, ¶¶ 20–24, 241 Wis. 2d 804, 623 N.W.2d 751. For our purposes, it is sufficient to state that the moving party is entitled to summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See id.*, ¶ 24. This case involves no material factual disputes and turns on questions of law, which we resolve in favor of McNally.

not conferred on the corporation.[3] Thus, we conclude that DJ Hosts does not have immunity from the suit brought by McNally.

¶ 8. The Ho-Chunk's own tribal immunity from the type of lawsuit brought by McNally is beyond dispute. "[A]n Indian tribe is not subject to suit in a state court—even for breach of contract involving off-reservation commercial conduct—unless 'Congress has authorized the suit or the tribe has waived its immunity.' " *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe*, 532 U.S. 411, 414 (2001) (quoting *Kiowa Tribe v. Manufacturing Techs., Inc.*, 523 U.S. 751, 754 (1998)). In *Kiowa Tribe*, the United States Supreme Court declined to distinguish between a tribe's commercial and governmental activities for purposes of immunity from suits on contracts. *See Kiowa Tribe*, 523 U.S. at 760. Similarly, this court has recognized that the immunity of a tribe "extends to its business arms." *C & B Invs.*, 198 Wis. 2d at 108. However, neither the United States Supreme Court nor any Wisconsin court has addressed whether or under what circumstances a tribe's immunity extends to a corporation in which a tribe owns stock.

---

[3] Courts in some jurisdictions have analyzed the applicability of tribal sovereign immunity to separate entities in terms of waiver, asking whether and under what circumstances a tribe waives its immunity by operating through a separate entity. *See, e.g., In re Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc.*, 658 N.E.2d 989, 994–95 (N.Y. 1995). The parties, however, generally do not frame the issue in terms of waiver. We defer to the parties' presentation of the case, thereby considering the issue to be whether the Ho-Chunk's immunity extends to DJ Hosts in the first place.

¶ 9. DJ Hosts places primary reliance on four cases: *Duke v. Absentee Shawnee Tribe of Oklahoma Housing Authority*, 199 F.3d 1123 (10th Cir. 1999); *Trudgeon v. Fantasy Springs Casino*, 84 Cal. Rptr. 2d 65, 71 Cal. App. 4th 632 (Ct. App. 1999); *Gavle v. Little Six, Inc.*, 555 N.W.2d 284 (Minn. 1996); and *In re Ransom v. St. Regis Mohawk Education & Community Fund, Inc.*, 658 N.E.2d 989 (N.Y. 1995). All of these cases are easily distinguished.

¶ 10. *Trudgeon, Gavle*, and *Ransom* all involved corporations that were created by a tribe in the first instance. *Trudgeon*, 71 Cal. App. 4th at 635; *Gavle*, 555 N.W.2d at 287; *Ransom*, 658 N.E.2d at 991, 995. *Duke* is inapplicable for a number of reasons, not the least of which is that it involved subject matter jurisdiction, not tribal sovereign immunity. *See Duke*, 199 F.3d at 1124.[4]

---

[4] Although it is not clear from the case itself, *Duke v. Absentee Shawnee Tribe of Oklahoma Housing Authority*, 199 F.3d 1123 (10th Cir. 1999), apparently involved a state agency that was created under state statute on behalf of a tribe. The entity "was created to provide and maintain low-income housing for members of the Absentee Shawnee Tribe." *Id.* at 1124. According to *Duke*, the housing authority was organized under OKLA. STAT. tit. 63, § 1057. *Duke*, 199 F.3d at 1124–25. That statute reads, in part, as follows:

> There is hereby created, with respect to each Indian tribe, band, or nation in the state, a public body corporate and politic, to function in the operating area of such Indian tribe, band, or nation to be known as the "housing authority" of said Indian tribe, band, or nation, which shall be an agency of the State of Oklahoma, possessing all powers, rights, and functions herein specified for city and county authorities created pursuant to this act: Provided that said Indian housing authority shall not transact any business nor exercise its powers hereunder until or unless the governing council of said tribe, band, or nation, as the case may be, by proper resolution, declares that there is a need for an authority to function for said tribe, band, or nation.

¶ 11. In addition, the cases DJ Hosts relies on do not involve the transition issue raised by this case and discussed at oral argument. We asked at oral argument when it was that the Ho-Chunk's immunity attached to DJ Hosts. DJ Hosts responded that immunity attached when the Ho-Chunk purchased shares in DJ Hosts. The consequence of this view, DJ Hosts acknowledged, would be that all pre-existing creditors lost their right to sue or to continue a suit against DJ Hosts for breach of contract upon the Ho-Chunk's stock purchase. Yet this court has justified the seemingly unfair effects of sovereign immunity in the contractual context by suggesting that a party dealing with a tribe is remiss in failing to seek a waiver of immunity before conducting business with the tribe:

> "[P]laintiff is in a particularly poor position to complain of unfairness in light of the fact that he did not even avail himself of the protections that *were* available to him . . . . As was the case in *Sac and Fox*, the complaining party was 'free to request a waiver of sovereign immunity' before conducting business with the tribe, but did not do so. *Sac and Fox Nation* [*v. Hanson*], 47 F.3d [1061,] [] 1065 [(10th Cir. 1995)]."

*C & B Invs.*, 198 Wis. 2d at 111 (quoting *Federico v. Capital Gaming Int'l, Inc.*, 888 F. Supp. 354, 357 (D.R.I. 1995)). Of course, pre-existing creditors of a corporation such as DJ Hosts would have had no opportunity to seek a waiver.

¶ 12. We next observe that the courts in the decisions that DJ Hosts relies on endeavored to analyze whether a tribe-owned corporation was so integrated with the tribe that the policies behind tribal immunity were advanced by treating the corporation as a part of the tribe for immunity purposes. These policies include tribal self-determination, economic development, and

cultural autonomy. *Gavle*, 555 N.W.2d at 292. Surveying the cases, we discern the following non-exclusive list of factors:

(1) Whether the corporation is organized under the tribe's laws or constitution;

(2) Whether the corporation's purposes are similar to or serve those of the tribal government;

(3) Whether the corporation's governing body is comprised mainly or solely of tribal officials;

(4) Whether the tribe's governing body has the power to dismiss corporate officers;

(5) Whether the corporate entity generates its own revenue;

(6) Whether a suit against the corporation will affect the tribe's fiscal resources;

(7) Whether the corporation has the power to bind or obligate the funds of the tribe;

(8) Whether the corporation was established to enhance the health, education, or welfare of tribe members, a function traditionally shouldered by tribal governments; and

(9) Whether the corporation is analogous to a tribal governmental agency or instead more like a commercial enterprise instituted for the purpose of generating profits for its private owners.

*See Trudgeon*, 71 Cal. App. 4th at 638–39; *Gavle*, 555 N.W.2d at 294; *Ransom*, 658 N.E.2d at 992.[5]

¶ 13. In considering the applicability of these factors to DJ Hosts, we are particularly persuaded by the fact that, when a tribe purchases stock in an existing corporation, the tribe can choose to limit its risk to its investment in the stock. Indeed, the limited liability attribute of corporations is hailed as the ultimate significance of the corporate form. *See Benjamin Plumbing, Inc. v. Barnes*, 162 Wis. 2d 837, 850, 470 N.W.2d 888 (1991) (citing R. HAMILTON, THE LAW OF CORPORATIONS §§ 2.1, 2.5 (1980)).

¶ 14. *Ransom*, one of the cases relied on by DJ Hosts, provides a good example of the application of the various factors. In *Ransom*, the tribe established and funded a non-profit social services corporation for the benefit of tribe members. *Ransom*, 658 N.E.2d at 991, 993, 995. The *Ransom* court concluded that this corporation was "so closely allied with and dependent upon

---

[5] We recognize that the United States Supreme Court's decision in *Kiowa Tribe v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 760 (1998), does not distinguish between a tribe's commercial and governmental activities for purposes of contract actions, whereas at least one of the above-listed factors does. *Kiowa Tribe* involved a suit directly against a tribe, not against a separate entity. Accordingly, the applicability of *Kiowa Tribe* to the questions of whether and when tribal immunity extends to a separate entity in which a tribe owns stock is not apparent. In any event, we do not read *Kiowa Tribe* in the expansive manner argued by DJ Hosts, that is, we do not read *Kiowa Tribe* as standing for the proposition that any time a tribe purchases all of the stock in a separate, ongoing non-tribal commercial entity, tribal immunity is conferred on the purchased entity.

the tribe that it is entitled to the protection of tribal sovereign immunity." *Id.* at 993.

¶ 15. The non-profit corporation in *Ransom*, created by the tribe to provide direct services to tribe members, holds a place on the other end of the spectrum from the situation before us. So far as we can tell from the record, none of the factors listed above appreciably weigh in favor of DJ Hosts. It may be true that the Ho-Chunk does or can exercise complete control over the operations of DJ Hosts by virtue of its stock ownership, but control in this sense is not enough.[6] If it were, immunity would attach whenever a tribe purchased a controlling interest in an ongoing, non-tribal for-profit corporation.

¶ 16. Notably, one case DJ Hosts relies on undercuts its argument. In *Trudgeon*, the California Court of Appeal stated:

> [I]t is possible to imagine situations in which a tribal entity may engage in activities which are so far removed from tribal interests that it no longer can legitimately be seen as an extension of the tribe itself. Such an entity arguably should not be immune, notwithstanding the fact it is organized and owned by the tribe.

*Trudgeon*, 71 Cal. App. 4th at 639. Purchasing stock, even all of the stock, in an ongoing for-profit business seems to be just the sort of situation that the *Trudgeon* court envisioned would *not* confer immunity on the

---

[6] DJ Hosts asserts that the Ho-Chunk members managed and controlled DJ Hosts, but the portions of the record cited by DJ Hosts do not provide much information about tribal involvement in the management and control of DJ Hosts. Regardless, we will assume for purposes of this decision that the Ho-Chunk members exercise substantial or complete control of DJ Hosts.

corporate entity. Here, we have the additional fact that the corporate entity was not created by a tribe.

¶ 17. DJ Hosts argues that it was, in effect, incorporated or "created" by the Ho-Chunk when the Ho-Chunk purchased all of the shares of Carley Development Company and renamed Carley to DJ Hosts, Inc. We first note that DJ Hosts' argument is imprecise; Carley Development was renamed DJ Hosts *before* the Ho-Chunk purchased the stock. But regardless how or when the name change came about, basic corporate principles as applied to the undisputed facts here make clear that DJ Hosts was not "created" by a name change and stock purchase. "A change in the name of a corporation does not constitute a reorganization of the corporation . . . ." 6 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 2451, at 166 (perm. ed., rev. vol. 1996).

> A mere change in the name of a corporation generally does not destroy the identity of the corporation, nor in any way affect its rights and liabilities. A change of name by a corporation has no more effect upon the identity of the corporation than a change of name by a natural person has upon the identity of such person. It is the same corporation with a different name.

*Id.*, § 2456, at 172–74 (footnotes omitted). Moreover, "[t]here is no termination of corporate existence, as a matter of law, merely because of a transfer of all the corporate assets." 8 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 4087, at 499 (perm. ed., rev. vol. 2001). Rather, a corporation "ordinarily continues existing unless there is a fixed period of existence which has lapsed, the corporation has been voluntarily dissolved, or the state

813

has in some proper way taken away the corporate life." *Id.*, § 4080, at 495. Here, the articles of incorporation for Carley Development stated that "[t]he period of existence of the corporation shall be perpetual." The amendment to the articles in the record shows no changes to the articles other than the change in name to "DJ Hosts, Inc." We therefore reject DJ Hosts' argument that it was somehow created or incorporated by the Ho-Chunk.

¶ 18. Our holding today, reflecting the facts before us, is narrow. We conclude that when the sole facts are that an Indian tribe purchases all of the shares of an existing for-profit corporation and takes control over the operations of the corporation, tribal immunity is not conferred on the corporation. It follows that DJ Hosts does not enjoy tribal sovereign immunity from the suit brought by McNally.[7]

### *Whether the Ho-Chunk Is an Indispensable Party Under Wis. Stat. § 803.03*

■
¶ 19. Because we conclude that the Ho-Chunk's immunity does not extend to DJ Hosts, we also address the question that the circuit court did not: whether the Ho-Chunk is an indispensable party to this action

---

[7] We are uncertain what practical effect this decision has on the ability of tribes to acquire companies and extend tribal immunity to them. At oral argument, the attorney for DJ Hosts seemed to suggest that the transaction in this case could have been structured as an asset purchase and the dissolution of DJ Hosts, the result being that the Ho-Chunk would have directly owned the assets of DJ Hosts, rather than owning shares in a distinct corporate entity. If the purchase had proceeded in that fashion, the assertion of immunity from suit might be stronger. But, of course, we have no occasion to address that situation.

under WIS. STAT. § 803.03.[8] DJ Hosts argues that even if it was not cloaked with the Ho-Chunk's immunity, the Ho-Chunk is an indispensable party such that dismissal

[8] WISCONSIN STAT. § 803.03 reads, in part:

(1) PERSONS TO BE JOINED IF FEASIBLE. A person who is subject to service of process shall be joined as a party in the action if:

(a) In the person's absence complete relief cannot be accorded among those already parties; or

(b) The person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may:

1. As a practical matter impair or impede the person's ability to protect that interest; or

2. Leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his or her claimed interest.

. . . .

(3) DETERMINATION BY COURT WHENEVER JOINDER NOT FEASIBLE. If any such person has not been so joined, the judge to whom the case has been assigned shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If a person as described in subs. (1) . . . cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include:

(a) To what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties;

(b) The extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided;

(c) Whether a judgment rendered in the person's absence will be adequate; and

(d) Whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

of the action is required because the Ho-Chunk cannot be joined due to the tribe's immunity from suit.

¶ 20. The application of WIS. STAT. § 803.03 to undisputed facts is a question of law, which we review *de novo. See Dairyland Greyhound Park, Inc. v. McCallum*, 2002 WI App 259, ¶¶ .10, 25, 258 Wis. 2d 210, 655 N.W.2d 474.

■

¶ 21. The test of whether a party is indispensable has two parts. *Id.*, ¶ 9. Courts first determine whether a party is "necessary" for one of the three reasons set forth in WIS. STAT. § 803.03(1). *Dairyland*, 258 Wis. 2d 210, ¶ 9. If none of the requirements for being a necessary party are met, the inquiry ends. *Id.* If a party is "necessary," but cannot be made a party, we must decide whether "in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." WIS. STAT. § 803.03(3); *see also Dairyland*, 258 Wis. 2d 210, ¶ 9.

¶ 22. A party may be considered "necessary" for one of three reasons set forth in WIS. STAT. § 803.03(1). Because DJ Hosts has not told us which of the three reasons applies, we could stop here. *See MCI, Inc. v. Elbin*, 146 Wis. 2d 239, 244–45, 430 N.W.2d 366 (Ct. App. 1988) (courts need not consider undeveloped arguments). Nonetheless, we choose to put the issue to rest.

¶ 23. Looking to a brief that DJ Hosts filed in the circuit court, we find the following argument: the Ho-Chunk "would be a 'necessary' party to this case because it has a definite interest in the subject of the action and the tribe is so situated that the disposition of the case may impair or impede the tribe's ability to

protect that interest." This argument apparently corresponds to WIS. STAT. § 803.03(1)(b)1. We conclude that the argument is unpersuasive, and contrast the circumstances here with the situation in *Dairyland*.

¶ 24. In *Dairyland*, we considered whether Indian tribes were necessary parties in the context of an action brought by Dairyland Greyhound Park against then-Governor Scott McCallum. *Dairyland*, 258 Wis. 2d 210, ¶¶ 1, 11. Dairyland sought to enjoin the governor from renewing the state's gaming compacts with Indian tribes having reservations or other land in Wisconsin. The governor, much like DJ Hosts, moved to dismiss, arguing that the tribes were necessary parties. *See id.*, ¶¶ 1, 6, 11. Part of the test under WIS. STAT. § 803.03(1)(b)1. involves an inquiry into whether a party is situated such "that the disposition of the action in the [party]'s absence may . . . [a]s a practical matter impair or impede the [party]'s ability to protect [the party's] interest." WIS. STAT. § 803.03(1)(b)1.; *see also Dairyland*, 258 Wis. 2d 210, ¶ 17. Dairyland asserted that the tribes could not satisfy this part of the test because (1) the governor could adequately protect the tribes' interest, and (2) the tribes' participation in the litigation as amicus curiae ensured that their concerns would be heard. *Dairyland*, 258 Wis. 2d 210, ¶ 17. We determined that the tribes were "necessary" under subsection (b)1. because (1) the financial consequences to the tribe were, relatively speaking, greater, (2) the governor and the tribes had historically disagreed on issues relating to the scope of Indian gaming, and (3) the tribes appeared to be in a better position than the governor to advocate for supremacy of federal law over state law. *Id.*, ¶¶ 18–19.

¶ 25. We discern no similar cause for concern here. Regardless whether the Ho-Chunk has more at

stake than DJ Hosts, we can be confident here that the tribe and DJ Hosts do not have adverse positions and that DJ Hosts will make all of the arguments the Ho-Chunk would make because the Ho-Chunk's attorney is representing DJ Hosts.

¶ 26. Accordingly, we conclude that the Ho-Chunk is not a "necessary" party under WIS. STAT. § 803.03(1) and, thus, it cannot be an "indispensable" party.

### *Conclusion*

¶ 27. Having concluded that the Ho-Chunk's immunity does not extend to DJ Hosts, and that the Ho-Chunk is not an indispensable party to this action, we reverse the circuit court's order and remand the matter to the court to allow McNally to proceed with its action against DJ Hosts.

*By the Court.*—Order reversed and cause remanded with directions.