**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| RICHARD C. HOWSON, an individual,<br><br>Appellant,<br><br>v.<br><br>SIMILK INC. d/b/a SWINOMISH GOLF LINKS, a Washington For Profit Corporation,<br><br>Respondent. | No. 84628-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — This case requires us to determine whether a Tribal owned corporation and its off-reservation golf course are an "arm of the tribe" and thus protected by sovereign immunity against suit in state court.

The Swinomish Indian Tribal Community (Tribe) bought an existing Washington corporation, Similk, Inc. (Similk), that owned and operated the Similk Golf Course, outside the current Swinomish Indian Reservation (Reservation) boundary. After the purchase, the Tribe amended Similk's articles of incorporation, renamed the golf course

the Swinomish Golf Links (golf course), and tied the operation and the control of Similk and the golf course[1] to the Tribe's existing Swinomish Casino and Lodge (Casino).[2]

Richard Howson sued Similk in Skagit County Superior Court after he was injured on the golf course. Howson appeals the trial court's order dismissing his case under CR 12(b)(1) for lack of jurisdiction based on the Tribe's sovereign immunity.

We affirm.

I

A

The Tribe is a federally recognized Indian tribe under section 16 of the Indian Reorganization Act of 1934, 25 U.S.C. § 476. The Tribe occupies the Reservation, which is located on Fidalgo Island in Skagit County. The Tribe is a political successor in interest to certain tribes and bands that signed the 1855 Treaty of Point Elliot. U.S. v. Wash., 459 F. Supp. 1020, 1039, 1041 (W.D. Wash. 1978). The Tribe and its more than 1,000 enrolled members are governed by an 11-member Senate elected by the Swinomish people in accordance with the Swinomish Constitution and By-Laws. The mission of the Swinomish Senate includes protecting and enhancing the quality of life for Swinomish members by providing a combination of economic opportunity and a safety net of social services, protecting the culture and traditional practices of the Swinomish people, and exercising the powers of self-government by the Treaty of Point Elliot.

---

[1] We use Similk and golf course interchangeably in this opinion.
[2] The Casino operates through a compact with the State of Washington under the federal Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq. See also Pub. L. No. 100-497, 102 Stat. 2467 (1988). The Casino offers gaming, dining, lodging, and facilitates other recreational activities for guests.

Similk was incorporated in 1983 by Earl and Betty Ann Morgan. Similk's original purpose was to engage in the business of operating a golf course and selling oysters.

In September 2013, the Tribe bought all shares of Similk from a group of private owners. The transaction placed about 215 acres of land on Fidalgo Island, including what was then named the Similk Golf Course, under Tribal ownership. In a related transaction the same day, the Tribe bought adjacent uplands and tidelands property in and along Similk Bay. The Tribe bought Similk and the adjacent uplands and tidelands due, in part, to their cultural historical significance. The purchased lands are located within the original Swinomish Reservation as established in the 1855 Treaty of Point Elliot.

Soon after purchasing Similk, the Tribe renamed the golf course the Swinomish Golf Links. The Tribe licensed and trademarked the Swinomish name and feather logo image used by the Casino for use on all of the golf course's promotional and public-facing materials. The Tribe operates the golf course as an amenity of the Casino, including advertising "stay and play" packages with special rates at the golf course and a room at the Casino. The golf course has a separate page on the Casino website.[3]

The Swinomish Senate appoints the Similk board of directors (Board). The same month the Tribe bought Similk, the newly appointed Board amended Similk's articles of incorporation to state that "the Corporation shall be operated at all times for the benefit of, and to carry out the purposes of, it[s] Shareholder, Swinomish Indian Tribal Community, a tribal government organized under federal law."

---

[3] See https://www.swinomishcasinoandlodge.com/golf/, (last visited Oct. 17, 2023).

The Board provides oversight of golf course operations. All Board members are elected members of the Senate, Tribal members, or Tribal employees. The Tribe's Gaming Enterprise Management Board (Gaming Board), also appointed by the Swinomish Senate, sets the policies related to the structure, activities, personnel, and finances of the Casino and the golf course. The golf course is treated as a department of the Casino and it is under the Casino's operating budget. Both Boards report directly to the Swinomish Senate, which has decision-making authority.

The relationship between Similk and the Casino began with a contract for professional consulting services in January 2014. The contract was significantly expanded by a Management Services Agreement (MSA) entered in May 2014. Under the MSA, Similk pays the Casino a monthly management fee for full management of golf course operations from the Casino, "including accounting, human resources, corporate governance, legal, recordkeeping, marketing, financial services, information technology, and advertising, strategy and management, and other services relating to the promotion of Swinomish Golf Links."

The Tribe contributes $250,000 annually to Similk for capital expenses. The Tribe has also responded with aid and support when the golf course experienced vandalism and flooding issues in 2018. The golf course offers free and reduced golf memberships and green fees to Tribal members and supports golfing programs for Tribal youth. The golf course is often used to conduct Tribal business and build relationships with other elected and business leaders.

B

In August 2021, Howson paid to play a round of golf on the golf course. Howson rented a golf cart. Howson was injured while operating the golf cart on the golf course when he struck a tree stump. Howson sued Similk in Skagit County Superior Court in August 2022.

Similk moved to dismiss Howson's complaint under CR 12(b)(1) for lack of subject matter jurisdiction. Similk argued the trial court lacked subject matter jurisdiction because the Tribe's sovereign immunity extended to Similk and the golf course. Based on the parties' agreement, the trial court applied the five factors set out in White v. Univ. of Cal., 765 F.3d 1010, 1025 (9th Cir. 2014) to determine whether Similk was an arm of the tribe. After weighing the factors, the trial court found that Similk was an arm of the tribe and dismissed Howson's case.

Howson appeals.

II

A

We review a trial court's dismissal under CR 12(b)(1) de novo. Long v. Snoqualmie Gaming Comm'n, 7 Wn. App. 2d 672, 679, 435 P.3d 339 (2019). When a defendant requests dismissal under CR 12(b)(1) for lack of jurisdiction based on sovereign immunity, "the party asserting jurisdiction has the burden of proving the other party has no immunity or waived it." Long, 7 Wn. App. 2d at 679. Thus, Howson has the burden of proving Similk does not have sovereign immunity.

Washington "[c]ourts have long recognized that 'tribal immunity is a matter of federal law and is not subject to diminution by the States.'" Foxworthy v. Puyallup Tribe

of Indians Ass'n, 141 Wn. App. 221, 226, 169 P.3d 53 (2007) (quoting Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 756, 118 S. Ct. 1700, 140 L. Ed. 2d 981 (1998)).  Thus, "Washington courts must and do apply federal law to resolve whether tribal sovereign immunity applies."  Long, 7 Wn. App. 2d at 681.

A federally recognized Indian tribe is immune from suit in state and federal courts absent an express and unequivocal waiver or congressional abrogation.  Auto. United Trades Org. v. State, 175 Wn.2d 214, 226, 285 P.3d 52 (2012); Kiowa, 523 U.S. at 754.  "A tribe's sovereign immunity extends to tribal commercial and governmental activities both on and off the tribe's reservation."  Foxworthy, 141 Wn. App. at 226; Kiowa, 523 U.S. at 754-55.

A tribe's sovereign immunity extends to a Tribal enterprise if that enterprise "functions as an arm of the tribe."  Allen v. Gold Country Casino, 464 F.3d 1044, 1046 (9th Cir. 2006).  "The question is not whether the activity may be characterized as a business . . . but whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe."  Allen, 464 F.3d at 1046.  "[T]he settled law of [the Ninth Circuit] is that tribal corporations acting as an arm of the tribe enjoy the same sovereign immunity granted to a tribe itself."  Cook v. AVI Casino Enters., 548 F.3d 718, 725 (9th Cir. 2008).

B

To determine whether a Tribal entity is entitled to sovereign immunity as an "arm of the tribe," we consider the five-factor test set out in White:

> (1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to

the sharing of its sovereign immunity; and (5) the financial relationship between the tribe and the entities.

765 F.3d at 1025 (quoting Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino and Resort, 629 F.3d 1173, 1187 (10th Cir. 2010)).[4]  No single factor is universally dispositive.  Both parties agree that the White factors should guide our analysis.  We address each in turn.

1

The first factor considers the method of creation of the entity.  White, 765 F.3d at 1025.  Howson asserts that because the Tribe bought Similk, an existing Washington Corporation, Similk is disqualified from being declared an arm of the tribe.

Formation under tribal law generally favors immunity, while formation under state law has been held to weigh against immunity.  Breakthrough, 629 F.3d at 1191.  But incorporation under state law is not necessarily dispositive.  See Cain v. Salish Kootenai Coll., Inc., No. CV-12-181-M-BMM, 2018 WL 2272792, at *2 (D. Mont. May 17, 2018) (court order) ("dual incorporation of the College under tribal law and state law does not disqualify the College from functioning as a tribal entity"); Manzano v. S. Indian Health Council, Inc., No. 20-cv-02130-BAS-BGS, 2021 WL 2826072, at *7 (S.D. Cal. July 7, 2021) (court order) ("Because the majority of the case law does not consider state incorporation detrimental to tribal status, the Court concludes that [the entity's]

---

[4] Breakthrough included a sixth factor, "the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities."  629 F.3d at 1187.  The Ninth Circuit adopted the first five Breakthrough factors, as did the Fourth Circuit.  See Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019).  The Williams court found that the sixth factor overlaps significantly with the first five and should instead inform the entire analysis.  Williams, 929 F.3d at 177.  And the White court explained "'preservation of tribal cultural autonomy [and] preservation of tribal self-determination,' are some of the central policies underlying the doctrine of tribal sovereign immunity."  765 F.3d at 1025 (quoting Breakthrough, 629 F.3d at 1188).

incorporation under state law does not mean its method of creation weighs against its claim to sovereignty."). "The circumstances under which the entity's formation occurred, including whether the tribe initiated or simply absorbed an operational commercial enterprise, are also relevant." People ex rel. Owen v. Miami Nation Enters., 2 Cal. 5th 222, 246, 386 P.3d 357, 211 Cal. Rptr. 3d 837 (Cal. 2016).

Howson argues that a Tribe cannot confer immunity on an existing corporation that has independent legal status, including the corporate right to sue and be sued.[5] Howson relies mainly on Somerlott v. Cherokee Nation Distribs., Inc., 686 F.3d 1144 (10th Cir. 2012), to argue that by purchasing Similk, the Tribe acquired both the corporation's privileges and responsibilities under Washington law. Howson cannot rely on Somerlott for several reasons.

First, Somerlott is a Tenth Circuit case decided before the Ninth Circuit's decision in White. Second, the Tenth Circuit's discussion of sovereign immunity is dicta because the court ultimately decided not to reverse the district court's finding of sovereign immunity because the appellant did not properly preserve the issue for appeal. See Somerlott, 686 F.3d at 1151-52. Third, Somerlott's analysis relied on a line of cases which hold that sovereign immunity does not extend to companies owned by the federal government but incorporated as distinct legal entities. 686 F.3d at 1150. These cases are distinguishable from this case in which a corporation was formed by nontribal

---

[5] RCW 23B.03.020(2)(a):
(2) Unless its articles of incorporation provide otherwise, every corporation has the same powers as an individual to do all things necessary or convenient to carry out its business and affairs, including without limitation power:
(a) To sue and be sued, complain, and defend in its corporate name.

members on ancestral tribal lands and years later a tribe purchases the land and business.

Because Similk's method of formation does not fit neatly within previously decided cases, Similk asserts that the history of the entity must be viewed in the context of the Tribe's actions following acquisition.

First, the Tribe's purchase of Similk and its adjoining land and tidelands was approved by a resolution by the Swinomish Senate. Second, following the purchase, the Tribe did not simply absorb an operational commercial enterprise. The Tribe immediately amended Similk's articles of incorporation establishing a new purpose that Similk must operate at all times to benefit and to carry out the purposes of the Tribe. Third, the Tribe changed the name of the golf course to Swinomish Golf Links and brought the entity under the management and control of its Casino.

In reply, Howson relies on McNally CPA's & Consultants, SC v. DJ Hosts, Inc., to assert that "[w]hen the sole facts are that an Indian tribe purchases all of the shares of an existing for-profit corporation and takes control over the operations of the corporation, tribal immunity is not conferred on the corporation." 2004 WI App 221, 277 Wis. 2d 801, 806, 692 N.W.2d 247. Again, Howson cannot rely on McNally. McNally was also decided before the Ninth Circuit adopted the five-factor "arm of the tribe" analysis in White. And the narrow issue addressed in McNally was whether a preexisting creditor of a corporation lost its right to sue once the corporation was bought

by a tribe. 277 Wis. 2d at 809. But, in this case, Howson's injury occurred years after the Tribe's purchase of Similk.[6]

Howson also contends that because no court has extended arm of the tribe immunity to a corporate entity bought by a Tribe, the Tribe has no power to extend its immunity to such an entity. But, at most, the fact that Similk was formed as a corporation under state law impacts only this first factor—and Howson's argument ignores the remaining factors courts must consider in making this determination.

While Similk was formed as a corporation under state law, the Tribe's actions upon acquisition are relevant considerations. Similk now operates solely to benefit the Tribe. But Similk is still a Washington corporation with the right to sue and be sued. We conclude that this factor is neutral.

2

The second factor considers the purpose of the entity. White, 765 F.3d at 1025. Howson argues that Similk's purpose is to operate a golf course. We disagree.

Inquiry into this factor begins with the entity's stated purpose. Breakthrough, 629 F.3d at 1193. To weigh in favor of immunity, the stated purpose need not be purely governmental so long as it relates to broader goals of tribal self-governance. Williams v. Big Picture Loans, LLC, 929 F.3d 170, 178 (4th Cir. 2019). If the entity was created to develop the tribe's economy, fund its governmental services, or promote cultural autonomy, its purpose pertains to tribal self-governance despite the entity's commercial

---

[6] Howson also cites Uniband, Inc. v. C.I.R., 140 T.C. 230 (2013) and Hunter v. Redhawk Network Sec., LLC, 6:17-CV-0962-JR, 2018 WL 4171612 (D. Or. 2018). Like McNally, Uniband was decided before White and applied a different test and was a tax case with different implications. Redhawk applied the five White factors and found three weighed against finding the entity was an arm of the tribe. 2018 WL 4171612, at *5.

activities. See Breakthrough, 629 F.3d at 1192 (tribal gaming authority and casino "were created for the financial benefit of the Tribe and to enable it to engage in various governmental functions").

Again, shortly after purchasing Similk the Tribe amended Similk's articles of incorporation to establish a new primary purpose of "operat[ing] at all times for the benefit of, and to carry out the purposes of, its Shareholder, Swinomish Indian Tribal Community." Thus, the stated purpose of Similk is to benefit the tribe and its members. Similk implements this purpose by operating the golf course to benefit the Tribe commercially, as well as Tribal members' well-being.

The golf course serves a commercial purpose by drawing guests to the Casino, much like the Casino's lodge rooms and suites, entertainment venues, restaurants, and RV park. The Tribe markets the golf course as an amenity of its Casino. The Casino offers "stay and play" packages, drawing more patrons to the Casino. This revenue all goes to the Tribe and supports the Tribe's governmental services and programs to support Tribal members. As the Ninth Circuit has recognized, commercial activities such as gaming benefit the Tribe and support sovereign immunity:

> With the Tribe owning and operating the Casino, there is no question that these economic and other advantages inure to the benefit of the Tribe. Immunity of the Casino directly protects the sovereign Tribe's treasury, which is one of the historic purposes of sovereign immunity in general. . . . In light of the purposes for which the Tribe founded this Casino and the Tribe's ownership and control of its operations, there can be little doubt that the Casino functions as an arm of the Tribe. It accordingly enjoys the Tribe's immunity from suit.

Allen, 464 F.3d at 1047 (internal citation omitted).

-11-

The Tribe also uses the golf course to promote the health of its members and enhance Tribal youth programs. In 2014, the Board adopted a resolution stating, "the Tribe is committed to providing benefits to its members and employees that promote and enable physical activity and skills, exercise and recreation, enjoyment of the outdoors, and general health and well-being." The resolution established a program offering significantly reduced fees for Tribal members and employees to become members of the golf course. In addition, the Swinomish Youth Center works with the golf course to coordinate golf activities for Tribal youth, including hosting golf camps. And Tribal leaders also use the golf course to conduct business and build relationships with elected and business leaders.

These purposes are consistent with a finding of sovereign immunity because Similk has helped develop the Tribe's economy, fund its government services, and render the Tribe more self-sufficient. We conclude that this factor supports finding Similk is an arm of the tribe.

3

The third factor considers the structure, ownership, and management of the tribal entity, "including the amount of control the tribe has over the entit[y]." White, 765 F.3d at 1025. Howson asserts that after the Tribe bought Similk, nothing about the structure, ownership, and management changed. We disagree.

When a tribe owns an entity, but delegates most of the control of the entity to nontribal members, this factor may weigh against a finding of sovereign immunity. See Breakthrough, 629 F.3d at 1193 (finding that a Casino with 15 directors, 12 of whom were not Tribal members, weighed against sovereign immunity). In contrast, Similk is

solely owned by the Tribe.  The Swinomish Senate has the power to manage all economic affairs and enterprises of the Tribe.[7]  The Senate appoints and oversees the Board.  The Board consists of five members who are either elected Tribal officials, enrolled Tribal members, or Tribal employees.  The Board reports directly to the Senate.

And the Tribe placed management of Similk under the control of the Casino through the MSA.  The services provided by the Casino include accounting, human resources, corporate governance, legal recordkeeping, marketing, financial services, information technology, advertising, strategy, and management.  The day-to-day managers of the golf course are employed by the Casino and report directly to the CEO of the Casino.  The Casino CEO is a long-time Tribal employee.

We conclude that this factor supports finding Similk is an arm of the tribe.

4

The fourth factor considers the Tribe's intent with respect to the sharing of its sovereign immunity.  White, 765 F.3d at 1025.  In some cases, the tribal ordinance, or articles of incorporation creating the entity, may express whether the tribe intended the entity to share in its immunity.  Breakthrough, 629 F.3d at 1193.  Articles of incorporation that are silent about sovereign immunity do not resolve an entity's claim to sovereignty.  See Wilson v. Alaska Tribal Health Consortium, 399 F. Supp. 3d 926, 932 (9th Cir. 2019) ("That [the entity's] Articles of Incorporation do not explicitly state that it has sovereign immunity, is not fatal to [the entity's] sovereignty status either").

---

[7] Candidates for the Swinomish Senate must be members of the Tribe along with other criteria.

Howson argues that to confer its sovereign immunity the Tribe should have purchased the property in its own name, instead of just purchasing all the stock, or placed the assets into a Tribal corporation. In response, the Tribe argues that it showed its intent to extend immunity to Similk in two ways: (1) by amending Similk's articles of incorporation right after the purchase to establish that at all times Similk must operate to benefit and to carry out the purposes of the Tribe and (2) by establishing comprehensive control over Similk's management and governance.

Neither the articles of incorporation nor the Senate's resolution approving the purchase of Similk explicitly mention the Tribe's intent to share sovereign immunity. While the intent may be inferred, changing the entity's purpose in its articles of incorporation, without more, is not enough to infer the Tribe's intent. And as discussed in factor one, the Tribe did not change Similk's corporate form and it remains a Washington corporation with the right to sue and be sued.

We conclude that this factor weighs against finding Similk is an arm of the tribe.

5

The fifth factor considers the financial relationship between the Tribe and the entity. White, 765 F.3d at 1025. Howson argues that the Tribe is protected from any judgment against Similk because Similk operates as a corporation with a separate legal status. And that the financial relationship between Similk and the Tribe is that of a typical business and business owner. We disagree.

The Tribe and Similk interconnect financially in several ways. First, the Tribe bought Similk and the adjacent tidelands and uplands for more than $5,000,000. The Swinomish Senate further recognized the need for Tribal financial support of Similk's

operations before the purchase by committing to fund the golf course operations for the rest of the year. Similk is also integrated into the financial functioning of the Casino. Besides accounting, payroll, and other financial services the Casino provides to Similk under the MSA, there is significant cash flow between the entities. Similk pays the Casino $30,000 per month for management services and the Tribe invests $250,000 annually in capital expenses at the golf course. Because Similk is treated as a distinct department under the Casino's operating budget, and a Similk operating profit—or loss—would end upon the books of the Casino.

Thus, even though the Tribe may be protected from direct liability, Similk and the Tribe are financially significantly intertwined. We conclude that this factor supports finding Similk is an arm of the tribe.

C

While one of the five White factors is neutral, and one factor weighs against immunity, we conclude that three of the White factors support the conclusion that Similk is an arm of the tribe and thus subject to sovereign immunity. We also conclude that sovereign immunity for Similk serves the central purposes underlying the doctrine because Similk is connected to the Tribe's economic development. White, 765 F.3d at 1026. Similk is thus entitled to sovereign immunity and the trial court did not err in dismissing the case.[8]

---

[8] In his reply brief, Howson argues that under the Washington State Constitution, the courts have an obligation to protect Washington's jurisdiction. WASH. CONST. art. IV § 6. Howson asserts that Washington courts cannot permit a tribe to take a corporation out of the jurisdiction of Washington courts. Contrary to Howson's assertion, this is not a case of Washington courts neglecting their duties, this is a case of a tribe reclaiming historically significant lands and purchasing a business that furthers its economic development, and conferring its sovereign immunity upon it.

We affirm.

_____ Mann, J.

WE CONCUR:

_____ Smith, C.J.

_____ Dwyer, J.