STATE of Colorado, ex rel. John W. SUTHERS, Attorney General, and Laura E. Udis, Administrator, Uniform Consumer Credit Code, Plaintiffs–Appellees,

v.

**CASH ADVANCE AND PREFERRED CASH LOANS, Defendants–Appellants.**

No. 07CA0582.

Colorado Court of Appeals, Div. II.

April 17, 2008.

As Modified on Denial of Rehearing July 10, 2008.

John W. Suthers, Attorney General, Paul Chessin, Assistant Attorney General, Denver, Colorado, for Plaintiffs–Appellees.

Jones & Keller, P.C., Thomas Burke, Jr., Edward T. Lyons, Jr., Denver, Colorado; Fredericks & Peebles, L.L.P., Conly J. Schulte, Shilee T. Mullin, Omaha, Nebraska, for Defendants–Appellants.

Wynkoop & Thomas, P.C., Richard B. Wynkoop, Denver, Colorado; AARP Foundation Litigation, Deborah Zuckerman, Michael Schuster, Washington, DC; Norman A. Googel, West Virginia Assistant Attorney General, Charleston, West Virginia, for amici curiae AARP; Center for Responsible Lending; Consumer Federation of America; National Association of Consumer Advocates; National Association of Consumer Agency Administrators; National Consumer Law Center; Talis J. Colberg, Attorney General, State of Alaska; Dustin McDaniel, Attorney General, State of Arkansas; Thomas J. Miller, Attorney General, State of Iowa; Paul J. Morrison, Attorney General, State of Kansas; Jeremiah W. Nixon, Attorney General, State of Missouri; Catherine Cortez Masto, Attorney General, State of Nevada; W.A. Drew Edmondson, Attorney General, State of Oklahoma; Donald K. Hardin, Administrator, Oklahoma Department of Consumer Credit; Deb Bortner, Division Director, Washington State Department of Financial Institutions Consumer Services Division; and Darrell V. McGraw, Jr., Attorney General, State of West Virginia.

Gill, Lindquist & Associates, LLC, Anne Whalen Gill, Castle Rock, Colorado, for ami-

cus curiae Gill, Lindquist, & Associates, LLC.

Opinion by Judge BERNARD.

In this interlocutory appeal, we discuss the parameters of a Colorado trial court's jurisdiction to determine the ownership and management of two Internet lending businesses in the face of claims that they are owned and operated by Indian tribes. We examine the analytical structure necessary to decide whether tribal sovereign immunity applies to these businesses, and, if so, whether it protects them, and individuals associated with them, from action undertaken by the Attorney General to enforce the Uniform Commercial Credit Code (UCCC) and the Colorado Consumer Protection Act (CCPA). For the reasons set forth below, we reverse the trial court's order and remand for further proceedings.

Table of Contents

| | | |
|---|---|---:|
| I. | Background | 394 |
| | A. Introduction | 394 |
| | B. Initial Discovery | 394 |
| | C. Motions to Dismiss | 395 |
| | D. Subsequent Discovery | 395 |
| | E. Attorney General's Questions About Ownership | 396 |
| | F. Trial Court's Order | 396 |
| II. | Syllabus | 397 |
| III. | Preliminary Issues | 398 |
| | A. Finality of Trial Court's Order for Appellate Purposes | 398 |
| | B. Waiver of Issue | 398 |
| IV. | General Principles of Sovereign Tribal Immunity | 398 |
| V. | Off-Reservation Conduct | 400 |
| VI. | Colorado Regulatory Scheme | 401 |
| VII. | Authority to Obtain Information | 401 |
| VIII. | Determining the Relationship Between the Tribes, the Corporations, and the Internet Lending Businesses | 403 |
| | A. New York | 403 |
| | B. Minnesota | 403 |
| | C. Arizona | 403 |
| | D. Alaska | 404 |
| | E. Washington | 405 |
| | F. Analysis | 405 |
| IX. | Tribal Officers and Members of Tribes | 406 |
| X. | Waiver | 407 |
| XI. | Burden of Proof on Remand | 408 |
| XII. | Conclusion | 410 |

(This Table of Contents and the section headings throughout this opinion are offered solely for the convenience of the reader and do not control or modify the substance of each section.)

## I. Background

### A. Introduction

In 2004, Colorado residents filed complaints with the Attorney General about two Internet businesses, Cash Advance and Preferred Cash Loans (Preferred Cash), centering on allegations they were making usurious small, short-term payday loans to Colorado residents via the Internet. The Attorney General opened an investigation, and later issued cease-and-desist letters to Cash Advance and Preferred Cash in November 2004.

"Cash advance loans" or "payday loans" are typically used by consumers who have few other sources from which to borrow funds in times of personal financial crisis. Creola Johnson, *Payday Loans: Shrewd Business or Predatory Lending?*, 87 Minn. L.Rev. 1, 8–11, 103 (2002). Such loans are often accompanied by interest rates higher than those charged by more traditional lending institutions. *Id.* at 2, 27.

### B. Initial Discovery

In January 2005, the Attorney General, employing the UCCC, sections 5–1–101 to –

9–103, C.R.S.2007, and the CCPA, sections 6–1–101 to –115, C.R.S.2007, issued investigative subpoenas to Cash Advance and Preferred Cash. These subpoenas were not answered.

In the course of this investigation, the Attorney General obtained documents indicating that C.B. Service Corporation (CBSC) did business as Cash Advance, and Executive Global Management Corporation (EGMC) did business as Preferred Cash. CBSC and EGMC were incorporated in Nevada, and listed addresses, consisting of different suites in the same building, in Carson City as their corporate headquarters. James Fontano was listed as CBSC's and EGMC's sole executive officer and director.

The administrative subpoenas were issued to the Carson City address, and ordered Cash Advance and Preferred Cash to produce documents describing their corporate structure—including listing the names of all principals and officers; listing any other names under which they operated; demonstrating their authority to conduct business; detailing all contact with Colorado consumers related to loan offers, agreements, and the collection of interest; itemizing any enforcement actions or litigation in which they were involved; and enumerating all Internet sites by which they did business. After these subpoenas went unanswered, the trial court, at the Attorney General's request, issued orders to comply that were again served in Carson City.

Because Cash Advance and Preferred Cash failed to honor the trial court's order to comply, the trial court authorized the Attorney General to serve citations on CBSC, Cash Advance, EGMC, Preferred Cash, and Fontano at their Carson City address to show cause why they should not be held in contempt. Up to this point, neither the trial court nor the Attorney General had received any information to indicate that CBSC, Cash Advance, EGMC, Preferred Cash, or Fontano was affiliated with any Indian tribes.

## C. Motions to Dismiss

In July 2005, CBSC, EGMC, and Fontano filed motions to dismiss, asserting they were not connected with Cash Advance and Pre-ferred Cash. Two corporations, Miami Nations Enterprises, Inc. (MNE), and SFS, Inc. (SFS), filed a joint motion to dismiss the proceedings against Cash Advance and Preferred Cash, although they had not been served with the cease-and-desist letters, the subpoenas, or the contempt citations.

MNE claimed it did business as Cash Advance, and stated it had been incorporated by the Miami Nation of Oklahoma, an Indian tribe. SFS claimed it did business as Preferred Cash, and stated it had been incorporated by the Santee Sioux Nation, another Indian tribe. MNE and SFS argued they owned and operated the Internet lending businesses, and therefore, Cash Advance and Preferred Cash were immune from any enforcement action the Attorney General might pursue because of the doctrine of tribal sovereign immunity.

The Miami Nation is recognized as an Indian tribe under the Oklahoma Indian Welfare Act of 1936, 25 U.S.C. §§ 501 to 509 (2007), and is headquartered in Miami, Oklahoma. The Santee Sioux Nation is recognized as an Indian tribe under section 16 of the Indian Reorganization Act of June 18, 1934, 25 U.S.C. § 476 (2007), and is located on the Santee Sioux reservation in Nebraska. We refer to the Miami Nation and the Santee Sioux Nation collectively as "the Tribes."

## D. Subsequent Discovery

In August 2005, the Attorney General issued written requests to the Miami Nation, MNE, Cash Advance, the Santee Sioux Nation, SFS, Preferred Cash, CSBC, EGMC, and Fontano to produce documents indicating the nature of their relationships with each other.

In September 2005, CSBC, EGMC, and Fontano filed a statement denying they had any documents that the Attorney General had requested. MNE and SFS separately filed a motion objecting to the Attorney General's request for documents, stating, in part, that they were not required to produce the documents based on tribal sovereign immunity. However, they agreed to make some documents available.

The Attorney General filed a motion to compel production of the documents it had requested from all parties. The trial court denied this motion in October 2005, finding the requests were too broad in light of the jurisdictional issue raised by the motion to dismiss pending before the court.

The trial court partially reconsidered this ruling in April and June 2006, after the Attorney General filed a second motion to compel the production of documents. The court concluded that some of the information would aid the court in deciding whether it had jurisdiction over Cash Advance and Preferred Cash, and ordered MNE and SFS to produce some of the documents by early July 2006.

In the course of these proceedings, MNE and SFS argued they had produced sufficient documentation to show that Cash Advance and Preferred Cash were "tribal entities," and were immune from the Attorney General's enforcement action because of tribal sovereign immunity. They objected to providing anything else.

### E. Attorney General's Questions About Ownership

The Attorney General produced evidence that raised questions about whether MNE and SFS owned and operated Cash Advance and Preferred Cash, and, if so, when they acquired them. For example, the Attorney General showed that the State of Kansas had commenced proceedings against Cash Advance to enforce its consumer protection laws. In a case that began in 2003, Fontano admitted he was president of Cash Advance, a subsidiary of CBSC, which was located in Carson City, Nevada. This Kansas case was settled in October 2005, when Cash Advance entered into a consent decree. There was no mention of tribal involvement in Cash Advance during these proceedings.

The Attorney General also provided an affidavit from a man who claimed to have incorporated CBSC and EGMC. He stated Cash Advance and Preferred Cash were subsidiaries of those two companies, respectively.

Documents provided by MNE and SFS indicated they may not have come into existence until after Colorado residents had filed the complaints that prompted the Attorney General's investigation.

### F. Trial Court's Order

In March 2007, the trial court denied the motions to dismiss filed by MNE and SFS. The court decided that, because CBSC and EGMC were the registered agents for Cash Advance and Preferred Cash, the two Internet businesses had been properly served with notice of the proceedings. The trial court also determined that the lending activities conducted by Cash Advance and Preferred Cash did not occur on tribal lands, but in Colorado.

The trial court's order refers to "tribal entities," although the trial court does not (1) indicate to whom or to what the phrase "tribal entities" refers; or (2) make factual findings and conclusions of law about the nature of the relationship between the Miami Nation, MNE, and Cash Advance, and between the Santee Sioux Nation, SFS, and Preferred Cash. Rather, the trial court concluded:

> Whether the Tribal Entities in this matter possess [sovereign tribal immunity], and whether they have or have not waived it, need not be determined by this Court. As [the Attorney General] correctly argue[s,] tribal sovereign immunity does not prohibit a state from investigating violations of its own laws occurring within its borders. . . .

> The Tribal Entities' motion to dismiss is denied insofar as it relies upon the doctrine of tribal sovereign immunity serving as a bar to the power of the State of Colorado to investigate and prosecute violations of its own laws, committed within the State of Colorado, by tribal entities acting outside of tribal lands.

The court ordered Cash Advance and Preferred Cash to appear at a hearing on the contempt citations. When these subpoenas were not honored, the trial court issued warrants for the arrest of Fontano; Don Brady, chief executive officer of MNE; and Robert Campbell, treasurer of SFS. The arrest war-

rants for these men were stayed pending this appeal.

MNE and SFS appeal, claiming they are doing business as Cash Advance and Preferred Cash, and that the doctrine of tribal sovereign immunity renders them immune from the Attorney General's enforcement action. The Attorney General disagrees with these contentions. CBSC, EGMC, and Fontano do not appeal.

## II. Syllabus

We conclude the record supports the trial court's determination that Cash Advance and Preferred Cash were doing business in Colorado, and not on tribal property. This finding is significant, because it indicates that Cash Advance and Preferred Cash are subject to at least some forms of regulation by the State of Colorado, even if they are part of an Indian tribe.

However, contrary to the trial court's judgment, this finding does not end the analysis. It is also necessary to determine the existence, nature, and degree of any connection between Cash Advance, Preferred Cash, MNE, SFS, the Miami Nation, and the Santee Sioux Nation in order to determine whether Cash Advance and Preferred Cash are immune from the Attorney General's enforcement actions and the trial court's contempt citations.

As a general matter, although Indian tribes are subject to some forms of state government regulation for commercial conduct occurring beyond tribal soil, they are immune from state enforcement actions. Here, the various statutes under which the Attorney General may proceed offer a host of enforcement mechanisms. To the extent that the trial court's reference to "tribal entities" indicated that the Miami Nation and the Santee Sioux Nation were subject to the Attorney General's enforcement actions, the trial court's order must be reversed.

However, the connections between the Miami Nation, MNE, and Cash Advance, and between the Santee Sioux Nation, SFS, and Preferred Cash are unclear. If Cash Advance and Preferred Cash are owned and operated by MNE and SFS in a manner that

makes them "arms" of the Miami Nation and the Santee Sioux Nation, then they are immune from the Attorney General's enforcement actions; if they are not "arms" of the Tribes, they are not immune. If they are immune, they may nonetheless be subject to enforcement actions if the Tribes have waived their immunity.

Because the trial court did not resolve these issues, and because the record does not contain sufficient information to allow us to determine the nature of those connections, we must remand this case for further proceedings.

To obtain sufficient information, the trial court should reevaluate the Attorney General's motion to compel the production of documents, and require the Miami Nation, MNE, Cash Advance, the Santee Sioux Nation, SFS, Preferred Cash, CSBC, EGMC, and Fontano to produce the documents and information necessary to the analysis we outline below. Once this information is provided, the trial court must hold a hearing and determine the following questions:

- Are Cash Advance and Preferred Cash owned and operated as "arms" of Indian tribes, and thus immune from the Attorney General's enforcement actions?

- If so, are any individuals associated with Cash Advance and Preferred Cash likewise immune?

- If Cash Advance and Preferred Cash are immune, has their immunity been waived?

Because MNE and SFS have filed motions to dismiss under C.R.C.P. 12(b)(1), arguing that the trial court does not have subject matter jurisdiction over the case by operation of the doctrine of tribal sovereign immunity, we conclude that, at the hearing on remand, the Attorney General must establish, by a preponderance of the evidence, that Cash Advance and Preferred Cash, and any individuals associated with them who may be the focus of enforcement actions, are not immune, or that, if they are immune, their immunity has been waived.

### III. Preliminary Issues

### A. Finality of Trial Court's Order for Appellate Purposes

The Attorney General argues we lack subject matter jurisdiction to decide this dispute because the trial court's order is not a final judgment and, therefore, not properly before this court. We are not persuaded.

■ Generally, this court is only permitted to review "final judgments." § 13–4–102(1), C.R.S.2007; *Paul v. People,* 105 P.3d 628, 631 (Colo.2005). Although we generally presume that interlocutory appeals are inappropriate for our review, "where specifically authorized by statute or rule, an appellate court may review interlocutory orders." *J.P. Meyer Trucking & Constr., Inc. v. Colo. Sch. Dists. Self Ins. Pool,* 18 P.3d 198, 201 (Colo. 2001).

■ Interlocutory appeal is only appropriate where the trial court's order is based on a question of law, not where a material, triable question of fact exists. *Furlong v. Gardner,* 956 P.2d 545, 548–49 (Colo.1998); *cf. Feiger, Collison & Killmer v. Jones,* 926 P.2d 1244, 1247–48 (Colo.1996) (denial of summary judgment motion is not an appealable interlocutory order). Whether a litigant is protected by tribal sovereign immunity is a question of law. *See Runyon ex rel. B.R. v. Ass'n of Village Council Presidents,* 84 P.3d 437, 439 (Alaska 2004).

■ A trial court's order may be deemed final for purposes of appeal where the court rules on a defense that provides immunity from suit. This extends to the issue whether an Indian tribe is immune from suit. *Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe,* 107 P.3d 402, 405–06 (Colo.App.2004).

Federal courts reach a similar result. *E.g., Burlington Northern & Santa Fe Ry. Co. v. Vaughn,* 509 F.3d 1085, 1089–91 (9th Cir.2007); *Berrey v. Asarco Inc.,* 439 F.3d 636, 641–42 (10th Cir.2006); *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians,* 63 F.3d 1030, 1050 (11th Cir.1995). The basis for this result is that immunity from suit is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *see also Kiowa Tribe v. Mfg. Technologies, Inc.,* 523 U.S. 751, 755, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998); *Big Valley Band of Pomo Indians v. Superior Court,* 133 Cal.App.4th 1185, 1189–90, 35 Cal. Rptr.3d 357, 360–61 (2005); *Rush Creek,* 107 P.3d at 405.

■ Our interlocutory review of this appeal is consistent with the characteristics and purposes of tribal sovereign immunity. Tribal sovereign immunity was created to protect tribal assets, preserve tribal cultural autonomy, and promote self-government. *See Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 510, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991); *Runyon,* 84 P.3d at 440. Because the immunity would be effectively lost if this case went to trial and a question of law exists that could resolve this case, we conclude, consistently with *Rush Creek* and the federal and state authority cited above, that an interlocutory appeal is necessary to ensure the immunity defense accomplishes its purpose in those instances where it is applicable.

### B. Waiver of Issue

■ MNE and SFS assert in their reply brief that the Attorney General waived the issue whether Cash Advance and Preferred Cash are entitled to raise tribal sovereign immunity as a defense. However, the Attorney General raised this claim at the trial level in his response to the motion to dismiss, and the state's assertion was countered in the reply filed by MNE and SFS. Thus, the Attorney General's claim was properly preserved. *See People v. Lesney,* 855 P.2d 1364, 1366 (Colo.1993).

### IV. General Principles of Sovereign Tribal Immunity

■ Indian tribes are viewed as "domestic dependent nations" that "exercise inherent sovereign authority over their members and territories." *Citizen Band Potawatomi Tribe,* 498 U.S. at 509, 111 S.Ct. 905 (quoting *Cherokee Nation v. Georgia,* 30 U.S. 1, 17, 5 Pet. 1, 8 L.Ed. 25 (1831)). Tribal immunity is a product of federal law and "is not subject to diminu-

tion by the States." *Kiowa Tribe,* 523 U.S. at 756, 118 S.Ct. 1700. This means that Congress has the ultimate authority to decide "whether, how, and where American Indian tribes may be sued, including the circumstances in which tribes may assert the affirmative defense of sovereign immunity." *Foxworthy v. Puyallup Tribe of Indians Ass'n,* 141 Wash.App. 221, 226–27, 169 P.3d 53, 55 (2007).

 Tribes are not free from regulation when they conduct economic activities off their reservations. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). Even where tribal sovereign immunity is found to apply to an entity, "tribal sovereignty is not absolute autonomy," and tribes are not permitted "to operate in a commercial capacity without legal constraint." *San Manuel Indian Bingo & Casino v. NLRB,* 475 F.3d 1306, 1314–15 (D.C.Cir.2007).

Thus, to the extent the Miami Nation and the Santee Sioux Nation are involved in the business of Cash Advance and Preferred Cash, their business is subject to regulation by the State of Colorado. This means the Tribes are generally subject to regulation under the UCCC, the CCPA, and the Deferred Deposit Loan Act (DDLA), sections 5–3.1–101 to –123, C.R.S.2007. *See Kiowa Tribe,* 523 U.S. at 755, 118 S.Ct. 1700.

 However, although the Tribes may be generally subject to regulation for off-reservation conduct, tribal sovereign immunity carries with it immunity from enforcement actions "absent a clear waiver by the tribe or congressional abrogation." *Citizen Band Potawatomi Tribe,* 498 U.S. at 509, 111 S.Ct. 905. In *Kiowa Tribe,* 523 U.S. at 760, 118 S.Ct. 1700, the Supreme Court held, "[Indian] [t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation."

The Supreme Court explained the apparent anomaly of subjecting a tribe to a state's regulation, but affording it immunity from enforcement actions:

We have recognized that a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country. To say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit. In [*Citizen Band Potawatomi Indian Tribe*] … we reaffirmed that while Oklahoma may tax cigarette sales by a Tribe's store to nonmembers, the Tribe enjoys immunity from a suit to collect unpaid state taxes. There is a difference between the right to demand compliance with state laws and the means available to enforce them.

*Kiowa Tribe,* 523 U.S. at 755, 118 S.Ct. 1700 (citations omitted).

 The scope of a tribe's immunity from enforcement actions is broad. It extends to civil suits for damages. *Id.* at 760, 118 S.Ct. 1700. It applies to requests for injunctive and declaratory relief. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58–59, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *Puyallup Tribe, Inc. v. Dep't of Game,* 433 U.S. 165, 171–73, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977); *Florida v. Seminole Tribe,* 181 F.3d 1237, 1244–45 (11th Cir.1999). We know of no act of Congress that indicates tribes are subject to criminal prosecutions in state courts, and we are not aware of any Supreme Court decision that concludes that a tribe's sovereign immunity does not apply in state court criminal proceedings. *See Narragansett Indian Tribe v. Rhode Island,* 449 F.3d 16, 28 n. 7 (1st Cir.2006).

 Therefore, to the extent that the trial court's reference to "tribal entities" constituted a reference to the Miami Nation and the Santee Sioux Nation, the trial court incorrectly determined that the doctrine of tribal sovereign immunity did not prevent enforcement action against them, and we reverse its order in that regard. Absent a waiver of immunity, which will be discussed below, we conclude that the Miami Nation and the Santee Sioux Nation are immune from any action—criminal, civil, or injunctive—the Attorney General may bring in a Colorado court to enforce the UCCC, the DDLA, and the CCPA.

However, this conclusion does not resolve whether Cash Advance and Preferred Cash are likewise immune. Because the record does not contain adequate information to resolve this issue, we conclude a remand is necessary for further proceedings, as we describe below.

The trial court concluded that Cash Advance and Preferred Cash engaged in conduct occurring in Colorado, beyond the borders of the reservations of the Miami Nation and the Santee Sioux Nation. This conclusion has important ramifications. If Cash Advance and Preferred Cash are not sufficiently affiliated with the Tribes to avail themselves of tribal sovereign immunity, they are not immune from the Attorney General's enforcement actions. If they are sufficiently affiliated, they are immune from enforcement actions. Thus, we proceed to review the trial court's findings and conclusions concerning whether Cash Advance and Preferred Cash were engaged in off-reservation conduct.

## V. Off–Reservation Conduct

■■■ The trial court made factual findings leading to its legal conclusion that the conduct being investigated by the Attorney General occurred outside the reservations of the Miami Nation and the Santee Sioux Nation. We conclude that these findings of fact were supported by competent evidence, and that the trial court's legal conclusion based upon these findings was correct.

■■■ In determining whether an activity was conducted off the reservation, courts generally look to where (1) the contract was entered into; (2) the contract was negotiated; (3) performance is to occur; (4) the subject matter of the contract is located; and (5) the parties reside. *Emerson v. Boyd*, 247 Mont. 241, 242–43, 805 P.2d 587, 588 (1991); *see Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 198 Colo. 444, 447–48, 601 P.2d 1369, 1372–73 (1979) (adopting same five-part test from Restatement (Second) Conflict of Laws § 193 (1971) to resolve conflict of law issues involving contracts).

Here, the trial court was required to make factual findings to apply this test, and so we are faced with a mixed question of law and fact, which we review de novo. *See Edge Telecom, Inc. v. Sterling Bank*, 143 P.3d 1155, 1159 (Colo.App.2006)(enforcement of forum selection clause).

■■■ Cash Advance and Preferred Cash were operating via the Internet. To guide our inquiry, we refer to cases describing the jurisdiction of a court over Internet business transactions. Whether a court has jurisdiction over an online business depends on the "nature and quality of commercial activity that an entity conducts over the Internet." *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir.1999) (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997)). "[W]here a defendant clearly does business over the Internet by entering into contracts with residents of other states which 'involve the knowing and repeated transmission of computer files over the Internet,'" jurisdiction in the state of the recipient is proper. *Id.* (quoting *Zippo Mfg. Co.*, 952 F.Supp. at 1124); *see also SCC Commc'ns Corp. v. Anderson*, 195 F.Supp.2d 1257, 1260–61 (D.Colo.2002); *cf. Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1299 (10th Cir.1999) ("maintenance of a passive website" is not enough to confer jurisdiction).

■■■ Business conducted over the Internet that would confer jurisdiction on a state court also demonstrates that the business activity constitutes off-reservation activity. *See Missouri ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1109 n. 5 (8th Cir.1999)(citing *AT & T Corp. v. Coeur D'Alene Tribe*, 45 F.Supp.2d 995, 999–1000 (D.Idaho 1998), *rev'd on other grounds*, 295 F.3d 899 (9th Cir.2002))("[The] Tribe's lottery is not on Indian lands when the wager is placed by telephone from off the reservation.").

The record indicates that Cash Advance and Preferred Cash are engaged in transactions over the Internet with consumers located in Colorado. There is evidence indicating that the contracts were entered into and negotiated in Colorado; the loans are delivered to consumers in Colorado; and performance will occur in Colorado because consum-

ers will repay the principal and pay interest here.

■ "A State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate State intervention." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 336, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983). Here, the off-reservation conduct falls into an area where the legislature and the Attorney General indicate there is an important need for regulation. We next describe Colorado's regulatory scheme relevant to regulating payday loans.

### VI. Colorado Regulatory Scheme

Regulation of loans in Colorado is accomplished through the UCCC and the DDLA. The UCCC is intended to be liberally construed to promote its underlying purposes and policies, which include "protecting consumer borrowers against unfair practices by some suppliers of consumer credit." *State ex rel. Salazar v. Cash Now Store, Inc.*, 31 P.3d 161, 166 (Colo.2001). The supreme court broadly interprets the terms of the UCCC in an effort to effectuate the legislature's intent to regulate businesses like Cash Advance and Preferred Cash Loans. *See id.*

The UCCC contains various enforcement provisions that apply to violations of the DDLA. § 5–3.1–119, C.R.S.2007 (provisions of UCCC apply to title 3.1 unless inconsistent). For example, failure to disclose information can result in civil liability. § 5–5–202, C.R.S.2007. Willful violations of the UCCC and disclosure violations are misdemeanors. §§ 5–5–301 & –302, C.R.S.2007. Section 5–5–301(4), C.R.S.2007, refers to section 18–15–104, C.R.S.2007, defining criminal usury as a class six felony, and section 18–15–107, C.R.S.2007, defining collection of extensions of credit by extortionate means as a class four felony, and states that conduct violating both the UCCC provisions and the criminal code provisions shall only be prosecuted under the criminal code provisions.

Under section 5–6–106, C.R.S.2007, the Administrator of the UCCC, who, in this case, is a member of the Attorney General's staff, has investigatory powers to be exercised when she has "reasonable cause to believe" the UCCC is being violated. This includes, in section 5–6–106(1) and (2), C.R.S. 2007, the authority to compel, by subpoena, the production of records and the appearance of witnesses to testify under oath. If the recipient of a subpoena fails to comply with it without lawful excuse, the Administrator may apply to the district court for an order requiring compliance. § 5–6–103, C.R.S.2007.

The Administrator may issue a cease-and-desist order, which may also require a creditor to refund charges in excess of the limits established by the UCCC and to pay a penalty, section 5–6–109, C.R.S.2007; seek a temporary restraining order or preliminary injunction in court, section 5–6–113, C.R.S. 2007; pursue a civil injunction, section 5–6–111, C.R.S.2007; request an injunction against an unconscionable agreement or fraudulent or unconscionable conduct, section 5–6–112, C.R.S.2007; or file a civil action to recover excess charges made or collected, section 5–6–114, C.R.S.2007. A party aggrieved by an administrative action taken by the Administrator may request judicial review. § 5–6–108, C.R.S.2007.

The CCPA regulates deceptive trade practices, which are listed in various sections, including section 6–1–105, C.R.S.2007. Its provisions may be enforced by the Attorney General. § 6–1–103, C.R.S.2007. In the course of enforcing the CCPA, the Attorney General has the authority to issue subpoenas to obtain documents and examine persons under oath. §§ 6–1–107 & –108, C.R.S.2007. The Attorney General may seek a court order to require compliance with a subpoena when a party fails to cooperate with an investigation. § 6–1–109, C.R.S.2007.

Remedies under the CCPA include temporary restraining orders, injunctions, and obtaining assurances of discontinuance, section 6–1–110, C.R.S.2007; civil penalties, section 6–1–112, C.R.S.2007; and damages, section 6–1–113, C.R.S.2007.

### VII. Authority to Obtain Information

As previously indicated, we conclude that this case must be remanded to the trial court to conduct further hearings. Before those proceedings are held, the trial court must

allow the Attorney General to obtain additional information. MNE and SFS contend tribal sovereign immunity prevents the trial court from enforcing the Attorney General's subpoenas to the Miami Nation, MNE, Cash Advance, the Santee Sioux Nation, SFS, Preferred Cash, CSBC, EGMC, and Fontano, which sought information necessary to resolve MNS's and SFS's assertion that Cash Advance and Preferred Cash are tribal entities immune from the Attorney general's regulatory investigation. We disagree.

■ "Whether a court has jurisdiction to proceed is a matter to be determined by the court, and when findings of jurisdictional facts are required, these findings must be made by the court prior to trial." *Guthrie v. Barda,* 188 Colo. 124, 126–27, 533 P.2d 487, 488 (1975). "[A]ny court is competent to resolve a fact upon which its own jurisdiction depends." *State ex rel. Danielson v. Vickroy,* 627 P.2d 752, 759 (Colo.1981).

*Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), arose out of a claim, made by a member of a tribe, that Nevada officials had violated his civil rights by executing a search warrant on property on the reservation to look for evidence of a crime committed off the reservation. The plurality noted: "Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border." *Id.* at 361, 121 S.Ct. 2304; *accord Dep't of Taxation & Finance of New York v. Milhelm Attea & Bros., Inc.,* 512 U.S. 61, 73, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994); *Ward v. New York,* 291 F.Supp.2d 188, 201 (W.D.N.Y. 2003). This reasoning led to the following distinction: conduct occurring on a reservation only involving Indians is not subject to state law, but, where state interests outside of the reservation are implicated by conduct on it, the state can "regulate the activities even of tribe members on tribal land." *Id.* at 362, 121 S.Ct. 2304.

The *Hicks* plurality, citing *Mescalero Apache Tribe v. Jones,* added that it is "well established in our precedent" that a state has criminal jurisdiction over Indians for crimes committed off of their reservations. *Id.* The Court then noted that states have the authority to execute process on Indian reservations, including search warrants. This is so, in part, because state regulation in these circumstances acts to "prevent [reservations] from becoming an asylum for fugitives from justice." *Id.* at 364, 121 S.Ct. 2304 (quoting *Fort Leavenworth R.R. Co. v. Lowe,* 114 U.S. 525, 533, 5 S.Ct. 995, 29 L.Ed. 264 (1885)).

■ Courts have authority to compel tribes to produce documents, particularly when the purpose of producing the documents is to enforce the law and protect the constitutional rights of defendants. *See Narragansett Indian Tribe,* 449 F.3d at 24–30 (search warrants by state agents); *In re Long Visitor,* 523 F.2d 443, 446 (8th Cir.1975)(federal grand jury subpoena); *United States v. Juvenile Male 1,* 431 F.Supp.2d 1012, 1019 (D.Ariz.2006)(federal subpoena); *United States v. Velarde,* 40 F.Supp.2d 1314, 1315–17 (D.N.M.1999) (federal subpoena); *United States v. Snowden,* 879 F.Supp. 1054, 1057 (D.Or.1995)(disclosure covered under federal statute); *United States v. Boggs,* 493 F.Supp. 1050, 1052 (D.Mont.1980) (federal subpoena); *cf. Kaul v. Stephan,* 83 F.3d 1208, 1216–18 (10th Cir. 1996) (when Congress has delegated jurisdiction to state over crimes committed on a reservation, state has authority to execute search warrants on the reservation); *United States v. Baker,* 894 F.2d 1144, 1146–47 (10th Cir.1990) (in the absence of state criminal jurisdiction, a state search warrant issued to search land on a reservation was invalid unless issued under Fed.R.Crim.P. 41 or was otherwise "federal in character"); *State v. Mathews,* 133 Idaho 300, 313, 986 P.2d 323, 336 (1999) (same as *Kaul* ). *But see Bishop Paiute Tribe v. County of Inyo,* 291 F.3d 549, 557–58 (9th Cir.2002) (tribe's sovereign immunity barred county's execution of warrant on reservation), *vacated and remanded on other grounds,* 538 U.S. 701, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003); *United States v. James,* 980 F.2d 1314, 1320 (9th Cir.1992)(subpoena for documents properly quashed because tribe was immune from process); *Catskill Dev., L.L.C. v. Park Place Entm't Corp.,* 206 F.R.D. 78, 86

(S.D.N.Y.2002)(sovereign immunity protected tribe from enforcement of civil subpoena).

■■■ There are four grounds supporting our conclusion that tribal sovereign immunity does not prevent the trial court from enforcing the Attorney General's subpoenas. First, the UCCC and the CCPA provide statutory authority for the Attorney General to obtain documents and other information in the course of investigations of violations of those two statutory schemes. The Attorney General's investigation concerns off-reservation activity, and the State of Colorado generally has jurisdiction to investigate, criminally prosecute, seek declaratory and injunctive relief, and pursue civil remedies for conduct occurring within its borders. Violations of the UCCC and the CCPA would have significant off-reservation effects that would require the Attorney General's intervention. *See Mescalero Apache Tribe,* 462 U.S. at 336, 103 S.Ct. 2378.

Second, the subpoenas do not authorize state agents to invade the territory of the reservation to obtain documents. Rather, they require production of documents in court, outside the reservation.

Third, MNE and SFS conceded below that the immunity they claim "shields Indian tribes and their entities from all facets of litigation, save discovery necessary to decide the issue of sovereign immunity."

■■■ Fourth, MNE and SFS admitted they "voluntarily provided the State with extensive discovery of documents relevant to the issue of whether the district court had subject matter jurisdiction." By providing the court with some of the documents relevant to the case, MNE and SFS waived whatever immunity they possessed to the disclosure of other such documents relevant to the trial court's jurisdictional determination, and cannot now assert that they are immune from producing additional documents pertinent to the determination of the tribal status of Cash Advance and Preferred Cash. *See James,* 980 F.2d at 1320.

Thus, the trial court has authority to order the Miami Nation, MNE, Cash Advance, the Santee Sioux Nation, SFS, Preferred Cash, CSBC, EGMC, and Fontano to honor the Attorney General's requests for information, to the extent that they are reasonably calculated to lead to the discovery of information relevant to the determinations the trial court must make on remand. We describe that material in more detail as we discuss the analysis the trial court must undertake.

## VIII. Determining the Relationship Between the Tribes, the Corporations, and the Internet Lending Businesses

The Supreme Court has yet to establish a test for determining when tribal immunity should be extended to tribal corporations. However, other courts have set forth different factors for determining when an organization is entitled to share in tribal immunity because it is so closely joined with, and dependent upon, a tribe as to be deemed an "arm of the tribe." We discuss these differing approaches in the process of determining a test the trial court should apply.

### A. New York

New York courts consider whether the entity is organized under tribal laws and constitution rather than federal law; the organization has purposes similar to those of tribal governments; the organization is primarily controlled and governed by tribal officials; and the tribe has legal title or control over the organization's property. *Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc.,* 86 N.Y.2d 553, 559, 635 N.Y.S.2d 116, 658 N.E.2d 989, 992 (1995).

### B. Minnesota

A court in Minnesota looked at three factors. (1) Is the purpose of the organization governmental, rather than commercial? (2) Are the tribe and the organization closely connected in their governing structure and other characteristics? (3) Are federal policies intended to promote tribal autonomy furthered by the extension of immunity to the organization? *Gavle v. Little Six, Inc.,* 555 N.W.2d 284, 294–95 (Minn.1996).

### C. Arizona

In *Dixon v. Picopa Construction Co.,* 160 Ariz. 251, 256, 772 P.2d 1104, 1109 (1989), the

Arizona Supreme Court determined that a construction company that had been incorporated by a tribe was not a "subordinate tribal organization." Thus, it was not cloaked with the tribe's sovereign immunity.

The Arizona court relied on several factors in reaching this conclusion. The construction company's status as a corporation indicated the tribe created it as an artificial individual, and no evidence indicated it was "intended to act or did act as an extension of tribal government." *Id.* at 258, 772 P.2d at 1111. The company's board of directors, which fully controlled the company, was separate from the tribal government. The company was covered by general liability insurance, which was evidence suggesting the tribe thought it was responsible for the consequences of negligence. The tribal ordinance incorporating the company indicated the company was created solely for a business purpose, and did not contain a declaration that the company's purpose was to promote the tribe's general economic development. Last, the company was simply a "for profit" corporation, and was not limited to carrying out tribal projects that would assist the tribe in its governmental functions.

When analyzing the doctrine of sovereign tribal immunity, the Arizona Supreme Court noted:

[S]ubstantial policy considerations militate in favor of recognizing immunity when a tribe conducts tribal business through a tribal economic entity.... [T]his record shows [that the construction company's] off-reservation activities ... were independent of any activity connected with tribal self-government or the promotion of tribal interests.

*Id.* at 256, 772 P.2d at 1109.

The Arizona court observed that withholding immunity would further the important public policy consideration of promoting commercial transactions between Indians and non-Indians.

Non–Indians will undoubtedly think long and hard before entering into business relationships with Indian corporations that are immune from suit. This may well retard a tribe's economic growth. Further, Congress's provision for allowing In-

dian tribes to segregate themselves into governmental and commercial corporate units arguably implies that "Congress did not intend *all* commercial activity" undertaken by Indian entities be immune from suit. Thus Congress itself recognized that immunity may have deleterious effects on a tribe's economic development.

*Id.* at 259, 772 P.2d at 1112 (emphasis in original; citations omitted) (quoting Thomas P. McLish, Note, *Tribal Sovereign Immunity: Searching for Sensible Limits,* 88 Colum. L.Rev. 173, 190 (1988)); *see also* David B. Jordan, Note, *Federal Indian Law: · Tribal Sovereign Immunity: Why Oklahoma Businesses Should Revamp Legal Relationships with Indian Tribes After Kiowa Tribe v. Manufacturing Technologies, Inc.,* 52 Okla. L. Rev. 489, 507–08 (Fall 1999) ("Economic relationships are built on equity and fairness, and if one party is bound while another is not, those at higher risk will limit their interaction with the low-risk party."); Brian C. Lake, Note, *The Unlimited Sovereign Immunity of Indian Tribal Businesses Operating Outside the Reservation: An Idea Whose Time Has Gone,* 1996 Colum. Bus. L.Rev. 87, 88 (1996) ("[A] non-tribal party dealing with an off-reservation tribal business is often unaware that the tribal business has the right to claim sovereign immunity, or even that the business is owned by an Indian tribe, and therefore is at a disadvantage in negotiating its transactions.").

### D. Alaska

For the Alaska Supreme Court, the primary factor to be considered in this analysis is the financial relationship between the corporation and the tribe. *Runyon,* 84 P.3d at 440–41. By examining the financial ties, the Alaska Supreme Court focused on one important goal of tribal immunity, which is protecting tribal assets. *Id.* at 440. Where the tribe's assets are vulnerable because of legal action against the entity, the tribe is the real party in interest, and immunity is more likely to be extended. In contrast, where the tribal treasury or tribal assets would not be at risk if the entity were sued, the entity is not an arm of the tribe and not entitled to the

protections of tribal sovereign immunity. *Runyon*, 84 P.3d at 441.

### E. Washington

In *Wright v. Colville Tribal Enterprise Corp.*, 159 Wash.2d 108, 147 P.3d 1275 (2006), a plurality of the Washington Supreme Court concluded: "Essentially, tribal sovereign immunity protects tribal governmental corporations owned and controlled by a tribe, and created under its own tribal laws. 'Tribal law corporations are assumed to be a subdivision of the tribal government.'" *Id.* at 113, 147 P.3d at 1279 (quoting Dao Lee Bernardi-Boyle, *State Corporations for Indian Reservations*, 26 Am. Indian L.Rev. 41, 57 (2001–2002)).

The plurality described this test—looking only to whether the corporation was "owned and controlled by a tribe, and created under its own tribal laws"—as being a bright-line rule that allowed a clear demarcation between those tribal corporations that are protected by sovereign immunity and those that are not. *Wright*, 159 Wash.2d at 114 n. 3, 147 P.3d at 1279.

A majority of five justices, two concurring and three dissenting, found this bright-line rule to be too limiting. The concurring justices looked to the *Ransom* factors. Citing *Trudgeon v. Fantasy Springs Casino*, 71 Cal. App.4th 632, 639, 84 Cal.Rptr.2d 65, 69–70 (1999) (applying *Gavle* factors), they added that the purpose for which the tribal entity was created was also important. *Wright*, 159 Wash.2d at 123, 125–26, 147 P.3d at 1285 (Madsen, J., concurring).

The dissenters stated they would apply a series of eleven factors distilled from *Ransom*, *Runyon*, *Gavle*, and *Dixon*, because the majority's approach "fails to acknowledge the importance of maintaining an ascertainable distinction between tribal entities and separate corporate entities." *Id.* at 130 n. 4, 147 P.3d at 1287 (Johnson, J., dissenting).

### F. Analysis

█ A corporation is more likely to be considered an arm of a tribe when it has been created to further some basic governmental objective, such as housing, education, health services, or establishing community programs. *Ransom*, 86 N.Y.2d at 559, 635 N.Y.S.2d 116, 658 N.E.2d at 992. Unlike in the gaming industry, there is no congressional declaration that quick cash loans are closely linked to the well-being of a tribe. *See* 25 U.S.C. §§ 2701 to 2721 (2007); *Gavle*, 555 N.W.2d at 295.

We are persuaded by the position of a majority of justices in *Wright* that the *Wright* plurality's bright-line test is too restrictive. As indicated above, most courts that have established or adopted tests for determining whether organizations are arms of tribes look to a series of factors. For example, in *McNally CPA's & Consultants, S.C. v. DJ Hosts, Inc.*, 277 Wis.2d 801, 810, 692 N.W.2d 247, 251–52 (Wis.Ct.App.2004) *(DJ Hosts)*, the Wisconsin Court of Appeals applied nine "non-exclusive" factors culled from *Ransom* and *Gavle*.

Further, the plurality in *Wright* placed great emphasis upon the language in *Kiowa Tribe* that indicated there was no distinction between a tribe's off-reservation commercial and governmental activities when determining whether a tribe was immune from suit. However, as the concurring opinion in *Wright* and the Wisconsin Court of Appeals in *DJ Hosts* observed, *Kiowa Tribe* involved a suit against a tribe, not a separate entity, and, thus, *Kiowa Tribe* did not resolve whether tribal sovereign immunity applies to tribal corporations. *Wright*, 159 Wash.2d at 116, 147 P.3d at 1280–81; *DJ Hosts*, 277 Wis.2d at 811 n. 5, 692 N.W.2d at 252. This reasoning led the court in *DJ Hosts* to state, "[W]e do not read *Kiowa Tribe* as standing for the proposition that any time a tribe purchases all of the stock in a separate, ongoing non-tribal commercial entity, tribal immunity is conferred on the purchased entity." *DJ Hosts*, 277 Wis.2d at 811 n. 5, 692 N.W.2d at 252.

█ We conclude that the use of a combination of eleven factors from *Ransom*, *Runyon*, *Gavle*, and *Dixon* applied by the dissenters in *Wright* properly balances tribal sovereign immunity and the need to maintain a distinction between tribes and separate corporations. This combination of factors provides a predictable and rational basis for

analysis. Thus, as described below, on remand the trial court should employ those eleven factors in determining whether the Cash Advance and Preferred Cash Internet lending businesses the Attorney General is investigating are arms of the Tribes.

The factors the court should consider to resolve this issue are: (1) whether Cash Advance and Preferred Cash are organized under the Tribes' laws or constitutions; (2) whether the purposes of Cash Advance and Preferred Cash are similar to the Tribes' purposes; (3) whether the governing bodies of Cash Advance and Preferred Cash are composed predominantly of tribal officials; (4) whether the Tribes have legal title to or own the property used by Cash Advance and Preferred Cash; (5) whether tribal officials exercise control over Cash Advance's and Preferred Cash's administration and accounting; (6) whether the Tribes' governing bodies have the authority to dismiss members of the governing bodies of Cash Advance or Preferred Cash; (7) whether Cash Advance and Preferred Cash generate their own revenues; (8) whether a suit against Cash Advance and Preferred Cash will affect the Tribes' finances and bind or obligate tribal funds; (9) the announced purposes of Cash Advance and Preferred Cash; (10) whether Cash Advance and Preferred Cash manage or exploit tribal resources; and (11) whether protection of tribal assets and autonomy will be furthered by extending immunity to Cash Advance and Preferred Cash.

The Attorney General is entitled to obtain information relevant to these factors. The trial court should review the Attorney General's discovery requests to ensure they are directed at obtaining such information.

If, after a hearing, the trial court determines that the Cash Advance and Preferred Cash Internet lending businesses under investigation are arms of the respective Tribes, then Cash Advance and Preferred Cash are immune from any enforcement action, unless their immunity has been waived. If the trial court determines they are not arms of the Tribes, then Cash Advance and Preferred Cash are not so immune, and enforcement actions may proceed.

## IX. Tribal Officers and Members of Tribes

Enforcement action has been undertaken against at least two individuals who claim to be officers of MNE and SFS by finding them in contempt. Therefore, we next evaluate the law extending tribal sovereign immunity to individuals.

Generally, tribal sovereign immunity bars claims for damages against tribal officers. *See Buchanan v. Sokaogon Chippewa Tribe*, 40 F.Supp.2d 1043, 1048 (E.D.Wis. 1999). However, in *Santa Clara Pueblo*, 436 U.S. at 59, 98 S.Ct. 1670, the Supreme Court determined that, although the tribe was immune from suit, the tribe's immunity did not protect tribal officials from suit when acting outside of their authority.

The reason for allowing suit against tribal officers when acting outside their authority is that "the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) (federal assets administrator); *see also Vann v. Kempthorne*, 467 F.Supp.2d 56, 73–74 (D.D.C.2006). Thus, "[w]hen the complaint alleges that the named [tribal officers] have acted outside the amount of authority that the sovereign is capable of bestowing, an exception to the doctrine of sovereign immunity is invoked." *Tenneco Oil Co. v. Sac & Fox Tribe of Indians*, 725 F.2d 572, 574 (10th Cir.1984).

There is no immunity for tribal officers acting beyond their authority, even if the state seeks injunctive or declaratory relief, or pursues criminal prosecution. *See Narragansett Indian Tribe*, 449 F.3d at 30 (criminal prosecution); *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 87–88 (2d Cir.2001)(equitable relief); *Ariz. Pub. Serv. Co. v. Aspaas*, 77 F.3d 1128, 1133–34 (9th Cir.1995)(prospective relief); *Sac & Fox Tribe*, 725 F.2d at 574 (declaratory and injunctive relief); *Vann*, 467 F.Supp.2d at 73–74 (declaratory relief); *Buchanan*, 40 F.Supp.2d at 1048 (injunctive and declaratory relief); *State v. Velky*, 263 Conn. 602, 611, 821 A.2d 752, 759 (2003) (criminal prosecu-

tion); *In re Waters of Humboldt River*, 118 Nev. 901, 910–11, 59 P.3d 1226, 1232 (2002)(contempt orders).

■ Individual members of tribes who are not tribal officers are not covered by sovereign tribal immunity for conduct beyond the reservation's borders. *Citizen Band Potawatomi Tribe*, 498 U.S. at 514, 111 S.Ct. 905; *Puyallup Tribe*, 433 U.S. at 171–72, 97 S.Ct. 2616; *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *Organized Village of Kake v. Egan*, 369 U.S. 60, 75, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) ("It has never been doubted that States may punish crimes committed by Indians, even reservation Indians, outside of Indian country.").

Here, the trial court issued contempt citations to MNE and SFS. When those organizations did not appear in response to the citations, the court issued arrest warrants for two men who are corporate officers of MNE and SFS. The record is unclear whether they are tribal officers, individual members of the Tribes, or non-Indians.

If, on remand, the trial court determines the men are tribal officers, then they are not subject to enforcement actions, including arrest, criminal prosecutions, contempt proceedings, or injunctive relief, unless they were acting beyond the scope of their authority by engaging in the specific conduct forming the basis of the enforcement action. For example, actions violating state law would be outside the scope of a tribal official's authority, because violating state law is beyond the official's powers and would, thus, not be the conduct of the sovereign tribes. *See Larson*, 337 U.S. at 690, 69 S.Ct. 1457.

If the trial court determines the men are immune, and that their immunity has not been waived, then any enforcement actions against them must be dismissed and the warrants for their arrest must be vacated. If they are not immune, they are subject to any enforcement actions for conduct beyond their reservations' borders that violates state law, including arrest, criminal prosecution, contempt proceedings, and suits for injunctive or declaratory relief. *See Puyallup Tribe v. Dep't of Game*, 391 U.S. 392, 396 n. 11, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968).

## X. Waiver

If the trial court determines that Cash Advance and Preferred Cash are arms of the Tribes, and thus protected by tribal sovereign immunity, the trial court must next determine whether the Tribes have waived their immunity.

■ Tribes can waive their sovereign immunity. *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. 1670. However, the waiver must be unequivocally clear, and cannot be implied. *Id.*; *Rush Creek*, 107 P.3d at 406. For example, in *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe*, 532 U.S. 411, 420–22, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001), the Supreme Court determined that a tribe waived its immunity from suit in state court because it entered into a contract that contained an express arbitration agreement.

■ Immunity may be waived by a tribe's or a tribal corporation's charter containing a "sue and be sued" clause, or by contract. *Wright*, 159 Wash.2d at 114–15, 147 P.3d at 1280. By consenting to sue and be sued in courts of competent jurisdiction, a tribe or a tribal corporation "render[s] itself amenable to the courts of the State of Colorado in any action of which the state courts may take cognizance." *Martinez v. S. Ute Tribe*, 150 Colo. 504, 510, 374 P.2d 691, 694 (1962); *see also Rosebud Sioux Tribe v. A & P Steel, Inc.*, 874 F.2d 550, 552 (8th Cir. 1989); *Kenai Oil & Gas, Inc. v. Dep't of Interior*, 522 F.Supp. 521, 528 (D.Utah 1981), *aff'd and remanded*, 671 F.2d 383 (10th Cir. 1982); *Parker Drilling Co. v. Metlakatla Indian Cmty.*, 451 F.Supp. 1127, 1136 (D.Alaska 1978); *Dacotah Properties–Richfield, Inc. v. Prairie Island Indian Cmty.*, 520 N.W.2d 167, 170 (Minn.Ct.App.1994). "[A] sue or be sued clause will only accomplish a waiver when the clause clearly expresses an intent to waive immunity," not where conditions placed on the waiver are left unmet. *Sanchez v. Santa Ana Golf Club, Inc.*, 136 N.M. 682, 686, 104 P.3d 548, 552 (N.M.Ct.App.2004)(citing *Martinez*, 150 Colo. at 508–10, 374 P.2d at 693–94).

Immunity may also be waived where a tribal corporation is incorporated "under state law, rather than tribal law." *Wright*, 159 Wash.2d at 115, 147 P.3d at 1280. Where a tribal constitution allows, someone other than tribal leaders may waive immunity. *Rush Creek*, 107 P.3d at 406–07.

Here, the Santee Sioux Nation's resolution establishing SFS and the articles of incorporation for SFS both stated that SFS "shall not have the authority to waive the sovereign immunity of the Santee Sioux Nation or [SFS] without the express written consent of the Santee Sioux Nation, evidenced by a duly enacted written resolution of the Santee Sioux Nation." The record does not contain any information indicating whether the Santee Sioux Nation enacted a written resolution waiving sovereign immunity for SFS.

The tribal act creating MNE contained substantially different language:

> [MNE] may be sued in the Tribal Court or in the Court of another jurisdiction in its own name upon any contract or obligation arising out of its activities in such other jurisdiction, and the immunity from suit which it has as a subordinate economic enterprise and political subdivision of the Miami Tribe of Oklahoma due to the doctrine of sovereign immunity is hereby expressly waived pursuant only to the extent of the specific terms of the applicable contract or obligation.

The record does not contain any contracts from Colorado consumers who filed complaints about Cash Advance. However, the Attorney General submitted sample contracts from similar Internet loan companies that contained agreements to arbitrate disputes under the Code of Procedure of the National Arbitration Forum. The Code in effect when the consumers filed the Colorado complaints contained two relevant rules:

> Rule 39E: An [arbitration award] may be confirmed, entered or enforced as judgment in any court of competent jurisdiction.

> Rule 43D: An [arbitration award] is reviewable by a court of competent jurisdiction as provided by applicable law.

National Arbitration Forum, Code of Procedure (July 1, 2003), *available at* www.adrforum.com/users/naf/resources/20030701 CodeOfProcedureAndFees.doc.

On remand, the trial court should require the production of relevant information to resolve this issue. Such information includes, but is not limited to, any written resolutions from the Miami Nation waiving sovereign immunity for MNE, and from the Santee Sioux Nation waiving sovereign immunity for SFS; any contracts between Colorado consumers and Cash Advance or Preferred Cash; and any other information that the Attorney General can specifically identify as being directly related to this issue, such as representations made by the Miami Nation, MNE, Cash Advance, the Santee Sioux Nation, SFS, Preferred Cash, CSBC, EGMC, and Fontano to third parties; statements made to borrowers; and evidence of conduct in other states.

Then, the trial court must determine whether one or both of the Tribes have waived their immunity. If the trial court determines they have not waived their immunity, then any enforcement actions against them must be dismissed. If they have waived their immunity, then the Attorney General may proceed with enforcement actions, and the trial court may proceed with the contempt proceedings.

## XI. Burden of Proof on Remand

Our final issue involves the allocation of a burden of proof to guide the proceedings on remand.

MNE and SFS raised the issue whether Cash Advance and Preferred Cash were immune from suit under the doctrine of sovereign tribal immunity. They relied, in part, upon C.R.C.P. 12(b)(1).

When a court's subject matter jurisdiction is challenged under C.R.C.P. 12(b)(1), and there are contested issues of fact, a court must hold a hearing to resolve them. *Rush Creek*, 107 P.3d at 406. At such a hearing, the plaintiff bears the burden of proving jurisdiction and that immunity, if any, has been waived. *See Trinity Broad. of*

*Denver, Inc. v. City of Westminster,* 848 P.2d 916, 925 (Colo.1993).

■ If the plaintiff fails to show that the trial court has subject matter jurisdiction, the court must dismiss the case. Any other order would be void. *See City of Boulder v. Pub. Serv. Co.,* 996 P.2d 198, 203 (Colo.App. 1999).

■ Our review of a court's ruling on a C.R.C.P. 12(b)(1) motion is deferential, and we review the trial court's factual findings to see if they are clearly erroneous. *Trinity Broad.,* 848 P.2d at 924–25. If the facts are undisputed, and the issue is purely one of law, we review the trial court's ruling de novo. *Springer v. City & County of Denver,* 13 P.3d 794, 798–99 (Colo.2000). The legal determination whether subject matter jurisdiction exists is a legal question which is also reviewed de novo. *Elrick v. Merrill,* 10 P.3d 689, 694 (Colo.App.2000). Thus, whether a court has jurisdiction over a party asserting tribal immunity is a question of law to be reviewed de novo. *Berrey,* 439 F.3d at 643; *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians,* 177 F.3d 1212, 1224 (11th Cir. 1999); *Runyon,* 84 P.3d at 439.

■ Although *Trinity* places the burden on the plaintiff to show whether a court has jurisdiction when issues of sovereign immunity have been raised, it does not state what the burden of proof should be. We conclude that, once a defendant organization submits evidence that it may be protected by the doctrine of tribal sovereign immunity, the burden should be on the plaintiff. Here, however, MNE and SFS have not yet submitted sufficient evidence to permit the trial court to determine that the Cash Advance and Preferred Cash Internet lending businesses are connected with the Tribes. When and if such evidence is presented, the burden will then be on the Attorney General to prove, by a preponderance of the evidence, that Cash Advance and Preferred Cash are not immune.

We reach this conclusion for four reasons. First, the burden of proof in civil cases is a preponderance of the evidence. § 13–25–127(1), C.R.S.2007.

Second, a federal court addressing this issue has applied the preponderance standard. *Akwesasne Hous. Auth.,* 268 F.3d at 84. Because our version of C.R.C.P. 12(b)(1) is similar to the federal version, we are guided by federal authority interpreting the counterpart to our rule. *See In re Estate of Krotiuk,* 12 P.3d 302, 305 (Colo.App.2000).

Third, other states have used the same standard. *See Lawrence v. Barona Valley Ranch Resort & Casino,* 153 Cal.App.4th 1364, 1369, 64 Cal.Rptr.3d 23, 26 (2007); *Bradley v. Crow Tribe of Indians,* 315 Mont. 75, 82, 67 P.3d 306, 311 (2003).

Fourth, a division of this court used the same analysis when concluding that the preponderance of the evidence standard should be used when analyzing governmental immunity in a whistleblower case. *Ferrel v. Colo. Dep't of Corr.,* 179 P.3d 178, 183 (Colo.App. 2007).

Thus, on remand, the Attorney General must establish, by a preponderance of the evidence, that Cash Advance and Preferred Cash are not arms of the Miami Nation and the Santee Sioux Nation. The Attorney General must also establish, by a preponderance of the evidence, that the individuals for whom the trial court issued arrest warrants are not entitled to immunity. If the trial court finds that Cash Advance and Preferred Cash are arms of the Tribes, the Attorney General must show, by a preponderance of the evidence, that they have waived their immunity.

If the trial court determines that Cash Advance, Preferred Cash, and the individuals whom the trial court issued warrants are immune, the court shall vacate the arrest warrants, and dismiss the cases and enforcement actions. If the court determines that they are not immune, the arrest warrants shall remain in effect, the stay on executing the warrants shall be lifted, and the cases and enforcement actions shall proceed.

We note this discussion of burden of proof pertains to the determination of questions of immunity when the issue of sovereign tribal immunity has been raised. If the trial court determines that Cash Advance, Preferred Cash, and the individuals for whom the trial court issued arrest warrants are not immune,

then the enforcement actions will be governed by the burden of proof that normally applies to such proceedings. *See, e.g.*, § 13–25–127(1) (burden of proof in civil cases is a preponderance of the evidence); C.R.C.P. 107(d)(1) (contempt must be proved beyond a reasonable doubt before punitive sanctions may be imposed); *People v. Jorgenson*, 185 Colo. 199, 201, 523 P.2d 121, 122 (1974) (in a criminal case, the burden is on the prosecution to prove every element of the change beyond a reasonable doubt); *In re Marriage of Cyr and Kay*, 186 P.3d 88, 92 (Colo.App. 2008) (remedial sanctions for contempt under C.R.C.P. 107(d)(2) are "civil in nature").

### XII. Conclusion

The judgment is reversed. The case is remanded to the trial court to conduct further proceedings as set forth in this opinion.

The arrest warrants to execute the contempt orders for Don Brady and Robert Campbell are stayed pending the trial court's decisions on remand.

Judge CARPARELLI and Judge METZGER * concur.